# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X    **Case No. 1-22-40568-nhl**

In Re:                                           [Subchapter V]

**Gillian Jordan, aka**
**Gillian Margaret Jordan-De Verteuil**

                      Debtor.

-----------------------------------------------------------------------X      Adversary No.

**Gillian Jordan aka Gillian Margaret Jordan-De Verteuil,**

         **Plaintiff,**

**v.**

**Doug Naidus,**

**World Business Lenders, LLC,**

**Worldwide Land Transfer**

**WBL SPE III, LLC,**

**The bank of Lake Mills, and**

**John Does 1-3,**

         **Defendants.**

-----------------------------------------------------------------------X

### RICO ADVERSARY COMPLAINT
### &
### OBJECTION TO PROOF OF CLAIM BY RECOUPMENT

**Karamvir Dahiya**

*Counsel for the Debtor Plaintiff*

**Dahiya Law Offices LLC**
**75 Maiden Lane Suite 606**
**New York New York 10038**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------X          **Case No. 1-22-40568-nhl**

In Re:                                                                                                [Subchapter V]

**Gillian Jordan, aka**
**Gillian Margaret Jordan-De Verteuil,**

                         **Debtor.**

----------------------------------------------------------------------X          Adversary Complaint No.

**Gillian Jordan aka Gillian Margaret Jordan-De Verteuil,**

                         **Plaintiff,**

**v.**

**Doug Naidus,**

**World Business Lenders, LLC,**

**Worldwide Land Transfer Inc.**

**WBL SPE III, LLC,**

**The bank of Lake Mills, and**

**John Does 1-3,**

                         **Defendants.**

--------------------------------------------------------------------X


**RICO ADVERSARY COMPLAINT**
**&**
**OBJECTION TO PROOF OF CLAIM BY RECOUPMENT**

Plaintiff, Gillian Jordan aka Gillian, Margaret Jordan-De Verteuil through her undersigned counsel

complaining of Doug Naidus, World Business Lender LLC, Worldwide Land Transfer Inc., WBL,

SPE III, LLC, and Bank of Lake Mill and others including John Does, alleges as follows:

## Introduction

> When news reached the New Gaol in New York late in March 18oo that Congress had passed a bankruptcy bill, the debtors imprisoned there gathered "to celebrate the auspicious event." They enjoyed "a rich repast of social conversation, on the prospect of returning to the world, and the bosom of our relatives and friends," then drank a series of seventeen formal and volunteer toasts: "*The Bankrupt Law, this Godlike act.*" "God forgive those of our creditors, who have reviled us and persecuted us, and spoke all manner of evil against us, for the sake of money." "May imprisonment for debt, with its corrupt and destructive consequences, no longer deface God's image." "May the pride of every debtor be to pay his just debts, if ever in his power; and *shun offers of credit in future as destructive to his life, liberty, and property*." "May wisdom and justice draw the line between the honest and fraudulent debtor."'

Bruce H. Mann. Republic of Debtors: Bankruptcy in the Age of American Independence (Kindle Locations 24-30). Kindle Edition.  May she "*shun offers of credit in future as destructive to [her] life, liberty, and property.*" Had it not been for this **The Bankrupt Law, this Godlike act,** Ms. Gillian Jordan would have been homeless by now.  Destruction has been unleashed by reckless lenders and unscrupulous pioneers of mortgage financial products, whose sole purpose was not to give mortgage to those who could service it and with proper terms, rather it was take over the security interests and with rapid pace of devouring it with default interest rates.  Doug Naidus is one of them who picked this art of lending from the past busted residential mortgage securities of 2007 that literally drowned the market to insolvency. What was done was with a nefarious design to make money at any cost, as was so well said by Marc Gott, a former director in Fannie's loan servicing department: "We didn't really know what we were buying, This system was designed for plain vanilla loans, and we were trying to push chocolate sundaes through the gears." —Charles Duhigg, New York Times, October 5, 2008. The financial managers reaped millions selling junk fraud laced mortgage securities. And those team members left to graduate to other similar fields

of lending and borrowing, with same deceptive skills and with the sole purpose of making money but at what cost. And defendant Naidus comes from that team.

2.      Defendant Naidus having tasted the market maneuvering and learning from the wall-street decided to create a new company with the lending sophistry and with least legal hurdles or regulatory supervision.  He created a new blend of banks without borders and regulation. And he found a ready example to emulate—Scott Tucker (Tucker).  Tucker had started his business modeled on making small, short-term, high-interest, unsecured loans, commonly referred to as "payday loans," through the Internet. Tucker with his team in and around 2006 was routinely charging interest rates of 600 percent or 700 percent, and sometimes higher than 1,000 percent. And most of these borrowers were struggling to pay basic living expenses. New York alone had more than 250,000 as his borrowers. Tucker ignored New York Usury restrictions and other federal consumer protection laws like Truth in Lending. And he could do the same with impunity, as he asserted that his lending company was not New York company, but a company operating under the laws of Native American tribes (Tribes). Beginning in 2003, Tucker entered into agreements with several Native American tribes, including the Santee Sioux Tribe of Nebraska, the Miami Tribe of Oklahoma, and the Modoc Tribe of Oklahoma.  The purpose of these agreements was to cause the Tribes to claim they owned and operated parts of Tucker's payday lending enterprise, so that when states sought to enforce laws prohibiting Tucker's loans, Tucker's lending businesses would claim to be protected by sovereign immunity.  In return, the Tribes received payments from Tucker, typically one percent of the revenues from the portion of Tucker's payday lending business that the Tribes purported to own.  It was the "Tucker Model."  Defendant Naidus modelled his new lending business after the Tucker Model but with refinement. Upon information and belief, Naidus had similar arrangements since 2014 with other banks and more relevant here is the Bank

of Lake Mills. Bank of Lake Mills was a willing partner in this criminal enterprise as explained below. It was the philosopher stone that attempted to change notorious loans exceeding 117% interest rate per annum to a federally preempted one thereby colluding with Naidus to escape state usury cap.

3.      Defendant Naidus did not want to be deterred by the New York state for that matter any other state regulatory usury caps.  He incorporated "Rent-a-Bank" scheme.  Around mid-2000s a number of payday lenders attempted to evade state regulation by purporting to use national and state-chartered banks as conduits for their loans. They theorized that, by partnering with a bank, they could avail themselves of the bank's preemption and rate-exportation privilege. See Jean Ann Fox, Consumer Federation of America, Unsafe and Unsound: *Payday Lenders Hide Behind FDIC Bank Charters to Peddle Usury* (March 2004).  Defendant Naidus moved that payday lending scheme to installment loans and lines of credit. And stripped of its baubles, that is his naked business.  Defendant Naidu in furtherance of his money-making venture created World Business Lenders LLC (WBL) to charter the course of this money-making venture, which is nothing more than a racketeering enterprise. Naidu and his team in collusion with the interrex banks used unlawful means to achieve unlawful results.  For the purposes of achieving unlawful hefty gains, WBL and its teams employed prohibited means including mail and wire fraud, unlawful debt collections as prohibited by racketeering provisions.  These defendants misled regulatory agencies, the courts and of course the victims.

4.      Defendant WBL was founded in 2011 with Manhattan its as its main office, then moved to Jersey, new Jersey in 2016 with lending operations now in Georgia, California, Connecticut, Florida and Texas.  It is in the business of lending short-term loans to small and medium-sized businesses and frequently rather most frequently, its customers are vulnerable minorities.  When

minorities are not able to get regular loans from the established banks, they fall easy prey to lenders like WBL. WBL marketing tool is primarily engaging bird-dogs who scour the local places and facilitate introduction of the gullible borrowers to WBL with whom they have a referral relationship. These registered or unregistered brokers, acting as agents for WBL takes the initiative, "flushing out" customers for WBL by soliciting prospective borrowers including "churning operations to solicit refinancing and consolidation. Ms. Jordan was approached by one such bird-dog, then there was no let go by WBL. They took her signatures and tied her with an extortionist credit scheme with a rate that violates the state and federal laws, with the active collusion of defendant Bank of Lake Mills (Lake Mills). A series of paperwork was created by WBL in the name of Bank of Lake Mills and which the Defendant Lake Mills proactively provided for commission. A scheme was set up to avoid New York usury caps and further in violation of mail and wire fraud. All the defendants participated one way or the other to achieve unlawful results. They used unlawful means to achieve unlawful results. Here, Mill Bank was the cat's paw, WBL was the cat.

5.      Numerous lawsuits and investigations by the government agencies resulted in Doug Naidus on or about December 9, 2022, declaring through a memo: "Our Company has experienced unplanned growth this year given market conditions. As a result, we have fully deployed our existing credit availability and must therefore suspend any further fundings and related operations until additional lending capacity is installed. During this interruption in our business and while we continue discussions with alternative capital sources, the company will take the opportunity to pivot to a new business model."  But where is the accountability for what was grimly stated by one New York appellate division court: "*one of the most heinous, virtually bloodsucking criminal*

*activities of all times.*" *Hammelburger v. Foursome Inn Corp.*, 437 N.Y.S.2d 356, 360 (N.Y. App. Div. 2d Dep't 1980).  That accountability is missing. It's time now.

## PREDICATE

6.      This Complaint alleges, *inter alia*, violations under The Organized Crime Control Act of 1970, *Pub. L. No. 91-452*, Section 901(a), *84 Stat. 941*, Racketeer Influenced and Corrupt Organizations ("RICO"), the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA"), New York civil and criminal usury laws GOL § 5-501 [1], [2]; Banking Law § 14-a [1]; Penal Law § 190.40 and 11 U.S.C. § 502 (allowance and disallowance of claims). This action is brought by Ms. Jordan  in connection with a scheme devised, conducted, and/or participated in by Defendants  and each of whom was employed by or associated with the loan issuance and collection of the unlawful debt to conduct or participate, directly or indirectly, in the conduct of association in fact through a pattern of racketeering activity, and to conspire to do so, and to wrongfully and unlawfully take over the unlawful debt lien and to conspire to do so, all to the detriment of the debtor plaintiff and others, thus victimizing both consumers and states.

7.      This action also arises out of WBL and its agents and affiliates discriminatory targeting of minorities, people of color for abusive credit terms in home loan repayment transaction, business purchases and or operations.  Promising these small businesses, the American dream of entrepreneurship, Naidus and his bird-dogs ensnared vulnerable borrowers' residents in predatory and discriminatory contracts that were structured to fail.

8.      Naidus and his team induced small business owners, retail stores and or struggling business owners with homes to sign contracts based on a false promise of extension of credit. In reality, WBL's practices gave prospective homebuyers almost no chance of success. WBL misrepresented the nature of the transaction, failed to disclose the cost of credit in its alternative financing

arrangement, failed to disclose significant problems with the consequences of non-payments, and attempted to reap enormous profits from its false promise of credit lines.

9.      Naidus and his team target vulnerable minorities borrowers.[1] Naidus uses untraditional means to provide traditional funding. The targets are picked based on making assessments of the sophistication of the borrowers. It is the gullible, not very sophisticated ones that were induced to sign paperwork which were trapped by these unwary borrowers to lose their homes and businesses. WBL marketed its credit scam in a localized manner intended to reach almost exclusively minority business owners like Ms. Jordan.  Ms. Jordan like many others similarly situated borrowers, have been injured by the intentionally discriminatory targeting of WBL's abusive and deceptive contracts to such borrowers.

10.     The relief sought includes actual damages, punitive damages and treble damages arising from the scheme to defraud set forth herein, restrictions on future conduct, an accounting, costs of investigation and suit, moratory interest and attorney's fees.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Ms. Jordan federal claims pursuant to 28 U.S.C. §§ 1331, 2201(a),  18 U.S.C. § 1964(c), 42 U.S.C. § 3613(a). Jurisdiction is also vested owing to 28 U.S.C § 1345 and 15 U.S.C § 1691(h). This Court has supplemental jurisdiction over Ms. Jordan's state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution. The bankruptcy jurisdiction is vested owing to 28 U.S.C. §1334 and also section 157

---

[1] **World Business Lenders** is a direct lender specializing in providing real-estate secured business loans and access to capital to support the growth and development of under-served small-to-medium sized businesses that *lack access to traditional funding.*"  https://www.wbl.com/about/

providing core jurisdiction dealing with allowance and disallowance of claim against the estate and thus, this adversary proceeding arises under Title 11 and arises in  and is related to the chapter 11 case pending in this Court.

12.     This Court further has personal jurisdiction over Naidus and other defendants under 28 U.S.C. § 1965(b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.  Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over the defendants.

13.     This Court has personal jurisdiction over the defendants because the defendants have purposefully directed their conduct at this forum with respect to the unlawful funding and collection of the debt and as well obtained liens on the plaintiff's properties.

14.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Ms. Jordan's claims occurred in the Eastern District of New York.

15.     Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact their affairs in this district. Venue is further proper in this District pursuant to 18 U.S.C. § 1965(a) because each defendant is found and/or transacts his affairs in this District given each defendant's participation in the alleged Association-in fact-Enterprise and as well as the Kings County Supreme Court Enterprise, as alleged below.

16.     Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

17.     The Plaintiff consents to entry of final order or judgement by this Court.

**RELEVANT TIMES**

18.     The relevant times to this Complaint are from on or about January 2016 continuing to the filing of this Complaint, when Ms. Jordan was roped in for the usurious loan with false assurances and then commencement of the foreclosure action in the state court based on fraudulent representation calculated to mislead the state court and as well as New York state regulatory bodies.  The relevant time is still open ended with defendants continuing with criminal activity in this bankruptcy court (Relevant Times).

**PARTIES**

19.     Plaintiff, Gillian Jordan aka Gillian, Margaret Jordan-De Verteuil (Ms. Jordan) is an individual, resident of Brooklyn, New York.  She is the owner of wholly owned Noah's Ark Preparatory II, Inc. (**Noah**). Ms. Jordann is a "person" as defined in § 1961(3) to include "any individual or entity capable of holding a legal or beneficial interest in a property."

20.     Defendant Doug Naidus is an individual (**Naidus**). He is the founder and owner of the company World Business Lender LLC and SPE III, LLC and continues to direct the operations of World Business Lenders LLC and its affiliates.

21.      Defendant World Business Lender LLC (**WBL**) is a New Jersey Corporation, presently operating from New York Jersey and other states Georgia, California, Connecticut, Florida and Texas.

22.      Defendant Worldwide Land Transfer Inc. **(WLT)** is a Pennsylvania Corporation, providing title insurance and escrow services. Upon information and belief, it is the sister company of WBL and owned by Naidus.

23.     Defendant SPE II LLC (**SPE**) is an acquisition arm of WBL, incorporated in the State of Delaware maintaining a principal place of business at 101 Hudson Street, 33rd Floor, Jersey City, New Jersey 07302.

24.     Defendant Bank of Lake Mills (**BLM or Lake Mills**) is a Wisconsin state-chartered bank operating from 136 E Madison St. Lake Mills WI 53551.

## THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

25.     During the relevant times, the Defendants and Participants WBL, BLM conspired with one another to defraud Ms. Jordan, Kings County Supreme Court and New York regulators, and the Bankruptcy Court among others. As part of the scheme to defraud, the Defendants accomplished the corruption of principal officers (identities unknown) of BLM, and through such corruption gained their assistance to defraud Ms. Jordan and others of their assets and to divert unlawfully those assets to the benefit of themselves and others who had no lawful right to those assets. Same was possible using unlawful means achieving unlawful results—collection on unlawful debt as full described below.   The multifarious racketeering activities through which these broad objectives of the Defendants and Participants were carried out consisted of a complex pattern of individual transactions and groups of transactions.

26.     It was a part of the scheme to defraud that Participant WBL and BLM would and did agree and conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions of trust and fiduciary relationships with Ms. Jordan. The ignominy of their conduct was not confined to one borrower, it was several others borrowers that are scattered all over the country. But they all shared one characteristic—they were all minorities-vulnerable non-whites. Having saddled them with usurious loan with deceptive means to evade usury limits imposed by the states of each borrower, WBL and BLM helped each

other to carry out their devious lending. To the rest of the world, BLM was the lender, when in fact WBL was the true lender.   BLM earned its commission from collusion with WBL. WBL through their bird dogs scoured market, communities for vulnerable minority borrowers, WBL prepared the paperwork, WBL executed the paperwork. WBL had the loans issued by BLM. WBL had the liens obtained on the borrowers' home and or business assets in BLM's name. BLM stamps were used.  WBL immediately thereafter moved the loan on paperwork as assignee of the loan and mortgage. The scheme was simple, it wanted to wash away any legal responsibilities by avoiding the state regulations of the loans including the usury caps.  BLM is a Wisconsin state-chartered state based bank. And WBL used a evade premise to evade and avoid banking responsibility by projecting BLM as the true lender and claiming protection of the federal preemption laws, as Scott Tucker claimed sovereign immunity (a legal doctrine that generally prevents states from enforcing their laws against Native American tribes).

27.    Like national banks, state-charted banks have the right under federal law to export their home state's interest rate laws to other states. Thus, if the state in which a bank is chartered does not cap bank interest rates or has a parity law allowing it to charge any rate that another bank can, then there is no effective limit on the rate that the bank can charge in other states. High-cost, nonbank lenders seek to piggyback on this rate exportation ability and use the state-chartered bank as a cover to make loans in those states, even when the consumers' states' lending laws would not allow such high rates for nonbank lenders.  The claim to preemption as claimed by WBL in the Kings Country Supreme Court where it commenced its foreclosure action to collect on the unlawful debt was sheer fraud on state court.  As detailed, the National Bank Act does *not* apply to *state* banks, so they cannot directly take advantage of the NBA's preemption authority. The fact that state banks are insured by the FDIC also provides little or no federal preemption of state

regulation, as the Federal Deposit Insurance Act (FDIA) does not generally preempt state laws.  BLM is not a national bank, so state-chartered banks, the federal Riegle-Neal statute, 12 U.S.C. § 1831a(j), is the primary source of federal preemption of state law other than that dealing with rate exportation. Riegle-Neal provides that, if a state-chartered bank has a *branch* in another state, then the laws of the state that hosts the branch, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, apply to the branch to the same extent as they do to the branch of an out-of-state national bank. 12 U.S.C. § 1831a(j)(1). In other words, if a state law is preempted as to an out-of-state national bank branch, then it is preempted as to an out-of-state state-chartered bank branch as well. Riegle-Neal explicitly states that it "shall apply to any *branch* in the host State of an out-of-State State bank." 12 U.S.C. § 1831a(j)(1).  It does not state that it applies to out-of-state, state-chartered *banks*, but only to branches of such banks.  And here BLM does not have a branch in New York. A loan broker or other third-party (like what WBL is projecting itself) arranging credit is clearly not a branch of a state-charted bank.  Nor is a bank employee soliciting business in the host state unless the bank employee does so from a physical location in that state. The loan to Ms. Jordan as to other members who are not party to this lawsuit have been similarly saddled with these loans, with their loans arranged by WBL. Also, even if there is a local branch, it does not get the benefit as long as the loan is arranged from a banks 'home state, here Wisconsin.  If BLM is indeed the true lender, then it might also be a serious violation of New York Banking laws, for lack of compliance with the state regulations including a license to operate as a bank.

28.     Event though the Note provided that it is New York law which will apply to the loan, WBL asserted New York laws would not apply, as the Guarantee executed required application of Federal Laws. And also, Wisconsin laws in case not preempted by federal laws. Irrespective of the

foregoing, BLM was not the true lender, rather a subterfuge, a device used by WBL to avoid complying with the state regulated laws including usury cap limit. WBL falsely claimed that the loan was BLM loan, when it fact it had devised the terms, enforcement and ultimately recovery on the loan. WBL was the cat and BLM, the cat's paw to run the racketeering scheme to avoid detection by law enforcement agencies and bring extortionist credit to the vulnerable borrowers.

29.    That scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harm on Ms. Jordan and others. These discrete transactions and harms are listed herein.  The victims including Ms. Jordan of the unlawful patterns of racketeering activity suffered discrete losses because of these activities like loss of homes and other business assets.

30.    In carrying out the scheme to defraud Ms. Jordan, Defendants and Participant, Naidu, WBL, BLM engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud in violation of *18 U.S.C. § 1341*; wire fraud in violation of *18 U.S.C. § 1343*; bank fraud in violation of 18 U.S.C. § 1344, extortion and conspiracy to commit extortion in violation of *18 U.S.C. § 1951; extending, financing and collecting on extortionist credit transaction in violation of 18 U.S.C.§§* 891-984; obstruction and improperly influencing the bankruptcy court under *18 U.S.C. § 1503(a;* money laundering *18 U.S.C. §§ 1956, 1957.* Also, in carrying out the scheme to defraud The Bank, Defendants and Participants Naidus, WBL and BLM also engaged, *inter alia* in unlawful debt collection as described under 18 U.S.C. § § 1961(6), 1962(b), (c).

**Business Promissory Note, Guarantee and Security Agreement**

31.    There was a Promissory Note (**Note**) prepared by WBL. The Note was payable to "Bank of Lake Mills, its successors and/or assigns or order." The Note had to have the initials of WBL on the bottom of each page.  Interestingly the language of the Note also clubbed WBL along with the plaintiff as "Borrower." **Ex. A** (the **Note**).

32.     The Promissory Note was not brought to Ms. Jordan in a printed form for her to review. It is "DocuSigned. *Ibid.* She signed the Note as the director of Noah.  Thus, there is a Promissory Note dated January 26, 2016, purportedly issued by Noah, a business promissory note in the principal amount of $275,000 payable to Bank of Lake Mills, its successors and/or assigns or order.  The Promissory Note maturity date is May 01, 2017. The interest rate is 0.322592600000% per day until paid in full, that is 116.133% annually.

33.     Similarly, Ms. Jordan was made to execute a "Continuing Guaranty," dated January 26, 2016 regarding the Promissory Note.  **Ex. B. (the Guaranty)**. Like the Note, the Guarantee also bears WBL initial. She did not get a printed copy of the Guarantee to sign, rather the signatures were obtained via DocuSigned.

34.     On or about January 28, 2016, Ms. Jordan also executed a mortgage (as security for the loan of $275,000) of her Home in favor of Lake Mills, its successors and or assigns. **Ex. C. (the Mortgage**) Mortgage seems to have an ink signature. The Mortgage is to Lake Mills, however, the same has been prepared by WBL from their then office located at 120 West 45th Street, New York, NY 10036. Mortgage reflects that it is WBL that prepared it and got it executed for filing.

**Id.**

**The Promissory Note Covenants**

35.     The Note reflects a payment of $275,000 to be paid back by May 1, 2017, and with an interest rate of 116.133% a year. The Promissory Note states that "[t]his Loan Agreement, or an interest in this Loan Agreement, together with the rights to the Collateral, may be sold, assigned, transferred or conveyed by Lender one or more times." The Promissory Note further states,

> **(d) This Loan Agreement shall be governed by the laws of the State (or Commonwealth, as the case may be) of Borrower's address set forth above in Section I ("Borrower's State").**

The Note p. 15.   The Borrower's address is set forth as reflected § 1 of the Promissory Note states,

1.  **PROMISE TO PAY: Noah's Ark Preparatory,** Inc., **and Noah's Ark Preparatory** II **Inc.,** with its principal place of business located at 38-29 213th Street, Bayside, NY 11361, and 38-29 213thStreet, Bayside, NY 11361,, and WBL (individually and collectively, "Borrower"), respectively, do hereby promise to pay to the order of **BANK OF LAKE MILLS,** its successors and/ or assigns ("Lender") at its offices located at 136 E. Madison St., Lake Mills, WI 53551, or at such other location or in such other manner as designated by Lender, the sum of Two Hundred Seventy Five Thousand Dollars and Zero Cents ($275,000.00) ("Principal") plus interest at the daily interest rate set forth below in Section 2 in accordance with the payment schedule set forth below in Section 3.

Ibid, p. 10. In its heading Miscellaneous, the Promissory Note further instructs,

(e) Any action or proceeding to enforce any rights or obligations arising out of this Loan Agreement shall be commenced in any state or federal court located in Borrower's State, and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower at the address specified by Borrower above in Section I, or as otherwise provided by the federal law or the laws of Borrower's State. Borrower and Lender agree that venue is proper in such courts and that such courts shall have sole jurisdiction over such action.

Ibid at 15, Also about interest rate, the Promissory Note states,
'

(i)      Borrower expressly agrees that the interest rate set forth above in Section 2 is appropriate under the circumstances and shall be the applicable rate at which unpaid Principal (and Costs) shall bear interest under this Loan Agreement, notwithstanding any rate of interest prescribed by statute from time to time; provided, however, if fulfillment of any provisions of this Loan Agreement or any other instrument securing the Obligations is subject to a law that sets maximum interest rates or other charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (I) any such charge will be reduced by the amount necessary to reduce the charge lo the permitted limit and (IJ) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower and the obligations created by this Loan Agreement shall be fulfilled to the limit of such validity as is permitted by law.

Id at p 15.

**<u>The Guarantee Covenants</u>**

36.     On the same very day, i.e. January 26, 2016 of execution of the Promissory Note,

contemporaneously was executed the personal guarantee (the "Guarantee") of the plaintiff Ms. Jordan. **Ex.**

**B.** The Guarantee was not signed on a printed page, rather it is a DocuSigned copy.

The Guarantee encapsulates the following under the heading Notice to Guarantor:

> You are being asked to guarantee the past, present and future Obligations
> of Borrower. If Borrower does not pay, you will have to. You may also
> have to pay collection costs. Lender can collect the Obligations from you
> without first trying to collect from Borrower or another guarantor or
> proceedings against any collateral or other security for the Obligations.

The Guarantee p 1, page 23 of the DocSigned Version. The Guarantee has the following provision

for the laws to be applied to the for interpretation of guarantee and jurisdiction in case of dispute.

> **INTERPRETATION.** Lender is an FDIC insured, Wisconsin state
> chartered bank. CONSEQUENTLY, THIS GUARANTY WILL BE
> GOVERNED BY FEDERAL LAW APPLICABLE TO AN FDIC
> INSURED INSTITUTION AND TO THE EXTENT NOT
> PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF
> WISCONSIN WITHOUT REGARD TO CONFLICT OF LAW RULES.
> The legality, enforceability and interpretation of this Guaranty and the
> amounts guaranteed will be governed by such laws.

**Ibid at page 23 of the DocuSigned Envelop.**

> **JURISDICTION.** Guarantor irrevocably consents with respect to any
> suit, action or proceeding relating to this Guaranty or any of the other loan
> documents relating to the Obligations, that venue shall be either in
> Wisconsin, New York or the state (or commonwealth, as the case may be)
> of Borrower's principal place of business ("Borrower's State") and
> Guarantor waives personal service of process and agrees that a summons
> and complaint commencing an action or proceeding in any such court shall
> be properly served and confer personal jurisdiction if served by registered
> or certified mail to Guarantor at the address specified by Guarantor above,
> or as otherwise provided by the laws of the State of Wisconsin, the State
> of New York,. the Borrower's State, or the United States of America.
> Guarantor agrees that venue is proper in such courts.

**The Bank of Lake Mills**

37.     Lake Mills is a Wisconsin chartered bank located in Lake Mills, Wisconsin. On May 11,

2017, the Federal Deposit Insurance Corporation (FDIC) announced settlements with Bank of

Lake Mills, among others for unfair and deceptive practices, in violation of Section 5 of the Federal

Trade Commission (FTC) Act. The FDIC determined that Bank of Lake Mills, Freedom Stores, and MCS violated federal law prohibiting unfair and deceptive practices by, among other things:

> • Charging interest to consumers who paid off their loans within six months when the loans were promoted as six-month interest free;
> • Selling add-on products in conjunction with loans originated by the bank without clearly disclosing the terms of those products; and
> • Failing to provide consumers the opportunity to exercise the monthly premium payment option in conjunction with the purchase of optional debt cancellation coverage on loans originated by the bank through the Freedom Stores and MCS channels.

38.    As part of the settlement, the bank, Freedom Stores, and MCS stipulated to the issuance of respective Orders for Restitution and Orders to Pay Civil Money Penalties (collectively, FDIC Orders). The FDIC Orders require restitution of approximately $3 million to harmed consumers, and assess civil money penalties of $151,000 against Bank of Lake Mills.

### Lake Mills is not the true lender

39.   This complaint in essence is about the collusion of WBL and its agents with Lake Mills to deceive vulnerable borrowers like Ms. Jordan.  Lake Mills was not the true lender.[2]   It was WBL.

---

[2] In 2020, the Office of the Comptroller of the Currency issued a rule that would have effectively overturned the true lender doctrine. But Congress rescinded the OCC's true lender rule in 2021, thus barring the agency from promulgating another similar rule. Indeed, Congress's action in overturning the OCC true lender rule is a powerful statement in support of using the true lender doctrine to attack rent-a-bank schemes and against the view that federal law makes the bank as the lender merely because, as stated in the rule, the bank "(1) Is named as the lender in the loan agreement; or (2) Funds the loan." 85 Fed. Reg. 68,742 (Dec. 29, 2020) (finalizing 12 C.F.R. § 7.1031(b)). In signing the resolution, President Biden stated:

> The … bill will protect borrowers against predatory lenders. In many states, these lenders are kept in check by caps on how much interest they can charge, but some loan sharks and online lenders have figured out how to get around these limits and—by using a partnership with a bank to avoid the state cap and charging outrageous interest. And I'm—you all have pointed out—some as high as 100 percent interest, which is astounding. And I must admit to you, I didn't know that. I was unaware they could pull that off.
>
> These are so called "rent-a-bank" schemes. And they allow lenders to prey on veterans, seniors, and other unsuspecting borrowers tapping in the—trapping

Lake Mills was the willing façade of lending. Lake Mills and WBL entered into a conspiracy to avoid application of New York state usury caps.[3]

40.  The true lender doctrine is an application of the centuries-old focus on substance over form when addressing usury evasions.[4]  WBL created a fraudulent impression that it was Lake Mills

---

them into a cycle of debt. And the last administration let it happened, but we won't.

Remarks by President Biden Signing Three Congressional Review Act Bills Into Law: S.J.RES.13; S.J.RES.14; and S.J.RES.15, 2021 WL 2679694 (June 30, 2021).

[3] *See* United States v. Grote, 961 F.3d 105, 122 (2d Cir. 2020) (finding sufficient evidence of wire fraud consisting of misrepresenting the true lender where "the Tribes had no meaningful influence or control over the lending business, but rather served merely as a cover"); Community State Bank v. Knox, 523 Fed. Appx. 925 (4th Cir. 2013) (affirming decision that determined that state-law usury claims were not completely preempted by the FDIA merely because a state-chartered bank was the named lender; plaintiff pleaded alternative theories that payday lender was the true lender or that it engaged in other unlawful activities as a loan broker); *Community State Bank v. Strong,* 651 F.3d 1241 (11th Cir. 2011) (finding federal jurisdiction because plaintiff could "plead facts demonstrating that the Bank was not the actual lender" and thus could be held liable under RICO for aiding or abetting a usury violation; agreeing with *BankWest* that "Section 27(a) [of the FDIA] does not provide immunity to a state bank for usury-related offenses if it is not the true lender of the loan under federal law"); B*ankWest, Inc. v. Baker*, 411 F.3d 1289 (11th Cir. 2005) (upholding Georgia statute deeming a purported agent of a bank to be the de facto lender if it has the predominant economic interest), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); Easter v. American West Fin., 381 F.3d 948 (9th Cir. 2004) (under Washington law, courts apply substance over form to determine whether broker, whose name was on the loan, was the true lender); Fed. Deposit Ins. Corp. v. Lattimore Land Corp., 656 F.2d 139, 147, n.15 (5th Cir. 1981) (describing *Daniel et al. v. First National Bank of Birmingham*, 227 F.2d 353, 355, 357 (5th Cir. 1956), as a case where "the transaction was usurious from the start and the bank was the actual lender," unlike in the instant case where "the obligors have never claimed that Hamilton National Bank was the lender in fact.").

The court in *Krispin v. May Department Stores*, 218 F.3d 919 (8th Cir. 2000), as well, found preemption of the usury claims against the store only after analyzing the facts and concluding that the store's national bank subsidiary was the real party in interest. *See also* Discover Bank v. Vaden, 489 F.3d 594, 604 n.9 (4th Cir. 2007) ("In finding Discover Bank to be the real party in interest here, we emphasize the heavily fact-dependent nature of our analysis and its consequent parameters. Clearly, a state-chartered, federally insured bank will not always be the real party in interest for purposes of invoking the FDIA."), *rev'd* 556 U.S. 49, 129 S. Ct. 1262, 173 L. Ed. 2d 206 (2009) (finding that complete preemption could not be based on counterclaim to state law claim).

[4] *Scott v. Lloyd*, 34 U.S. (9 Pet.) 418 (1835) (The ingenuity of lenders has devised many contrivances by which, under forms sanctioned by law, the [usury] statute may be evaded. . . . [I]f giving this form to the

that granted the loan. When in fact the loan came from WBL. It falsely misled the State Supreme Court by claiming by having structured it as a transaction so that a bank like Lake Mills appears to be the lender, when in fact it was WBL that has the dominant economic interest in the transaction. It led the deal. It contacted the plaintiff and it prepared the paperwork, it did everything before, during and after the transaction with the bank of Lake Mills. Lake Mills bank was the cat's paw, WBL, the cat. WBL used Lake Mills as the conduit for its loan. In fact, WBL made all the arrangements for the loan (advertising, underwriting, determining loan amount, and so forth) and takes all the economic risk from the loan—thus making it the true lender.

41. **Lake Mills is a Wisconsin State Bank.** "State bank" is defined as "any bank, banking association, trust company, savings bank, industrial bank (or similar depository institution which the Board of Directors finds to be operating substantially in the same manner as an industrial bank) or other banking institution" which is engaged in the business of receiving deposits other than trust funds. 12 U.S.C. § 1813(a)(2). Lake Mills is not chartered in New York state, where the plaintiff resides.

42. **Lake Mills did not extend any credit to Ms. Jordan through any of its local branch.** The term "branch" is strictly defined to mean a physical location: "any branch bank, branch office, branch agency, additional office, or any branch place of business located in" any state or dependency "at which deposits are received or checks paid or money lent," and "does not include an automated teller machine or a remote service unit. 12 U.S.C. § 1813(o). *Cf.* 12 U.S.C. § 3101(3) ("'branch' means any office or any place of business of a foreign bank located in any State of the United States at which deposits are received"). Lake Mills did not have a branch in New York.

---

contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.")

43.    **Lake Mills is charted in Wisconsin and has no branches in New York state.**  The federal preemptions, Riegle-Neal offers preemption only to branches of *out-of-state*, state-chartered banks, not to banks making loans in their own state. It "shall apply to any branch in the host State of an out-of-State State bank…"  12 U.S.C. § 1831a(j)(1). Second, even if it did apply, Riegle-Neal requires the bank to comply with its home state law, which is the law of the host state.

44.    WBL arranged for creditor for Ms. Jordan from Wisconsin bank, however then it is not the Wisconsin laws which would apply here in terms of interest rates.  For Riegle-Neal II preemption to apply, there must be strict compliance with Riegle-Neal II's statutory language. Riegle-Neal II extends preemption only to credit offered by a host state branch of an out-of-state, state bank. If an out-of-state, state-chartered bank does not have branches in the host state, then Riegle-Neal II does not apply. Riegle-Neal II states that it "shall apply to any branch in the host State of an out-of-State State bank." 12 U.S.C. § 1831a(j)(1). The FDIC itself stated,

> the preemption provided by section [12 U.S.C. § 1831a(j)] only operates with respect to a branch in the host state of an out-of-state, state bank. By its terms section [12 U.S.C. § 1831a(j)(1)] and therefore the proposed regulation, would not apply if the out-of-state, state bank does not have a branch in the host state.

Federal Deposit Ins. Corp., Proposed Rules, Interstate Banking; Federal Interest Rate Authority, 70 Fed. Reg. 60,019, 60,025 (Oct. 14, 2005). While the FDIC never finalized that 2005 proposed regulation implementing Riegle Neal, the regulation finalized in 2020 takes the same approach. *See* 12 C.F.R. § 331.3 (effective Aug. 21, 2020), *as adopted by* 85 Fed. Reg. 44,146 (July 22, 2020) ("Application of host state law. The laws of a host State shall apply to any branch in the host State of an out-of-State State bank . . . .") (emphasis added).

### Conspiracy between WBL and Lake Mills and Overview of the Unlawful Scheme

45.     At all times relevant to this period of loan transactions arranged, brokered or facilitated by WBL, Defendant Naidu owned and operated the lending businesses WBL  that issued short-term, high-interest, secured loans to customers all all across the country. And most of these borrowers were minorities with some assets, like home or business inventory.

46.     Although other business entities or lenders like Defendant Lake Mills were listed as the WBL's loans owners on certain documents, in truth and in fact, at all relevant times, Naidu was the source of the funds lent to customers by the WBL and WBL or Naidus bore the risk of non-repayment of the loans. In addition, it was Naidus through his agents and entities, controlled the other seemingly distinct entities like Defendant Lake Mills issuance of loans, its  finances, lending decisions, distribution of profits, advertising and solicitation of customers, and banking and other third party relationships.

47.     From at least 2016 and up to and including in or about now, through its companies Naidus and WBL and its associates, the defendants, systematically exploited hundreds of borrower who were struggling to pay for their consumer and small business loans.  Naidus and its agents extended loans to these vulnerable minority borrowers at usurious interest rates as high as 160%  or  more using deceptive and misleading communications and contracts, and in violation of the usury laws of numerous states, including New York State, that were designed to protect residents from such loan sharking and abusive conduct. In doing so, Naidus, WBL and used names of entities that they colluded with,  and thus providing a façade of a independent lenders, it forced many of these borrower into cycles of debt in which they incurred usurious loans, in order to pay off their existing debt and lose ultimately their businesses and homes.  Several lawsuit have been filed against WBL and its agents, however, there have been a very ready shield provided to ward of responsibility by claiming that they are not subjected to this host states like New York, as the consumer resides here,

for they would claim hat the loans are by out state lender with no usury cap and would also mislead the court by filing false statements with the court that the National Banking Act or Federal Deposit Insurance Act precluded them any responsibility towards usury caps. When in fact that they knew that the statements they were making and filing to asset the truth of transactions were false and calculating to deceive the courts, the regulator and the borrowers.

48.    Thus since at least 2016, to defeat the different borrowers state lawsuits, to attempt to avoid future civil and criminal liability for his conduct, and to enable the WBL lenders to persist in extending usurious loans contrary to state laws, Defendant Naidus, entered ' into sham business relationships with certain out of state banks with usury caps, and thereafter claimed that WBL could not be sued because they were /entitled to the protection of federal preemption that generally prevents states from enforcing their laws against these wrong doers. In  In particular, to defeat  the state lawsuits, attorneys for Naidus and his company defendant, prepared and submitted to courts materially false and misleading affidavits about the relationship between WBL and other stamping or colluding  to create the false impression that the other banks played a substantive role in the origination and assignment of the loans when in fact Naidus team and his company operation managers well  knew and played no such role, and were instead deliberately used by Naidus and WBL  as mere conduits for WBL 's unlawful business.

49.    The business model posited defendant is very simple:  BLM is a Wisconsin state bank. Like national banks, state-chartered banks have the right under federal law to export their home state's interest rate laws to other states. Thus, if the state in which a bank is chartered does not cap bank interest rates or has a parity law allowing it to charge any rate that another bank can, then there is no effective limit on the rate that the bank can charge in other states. That is why high-cost, nonbank lenders seek to piggyback on this rate exportation ability and use the state-chartered

bank as a cover to make loans in those states, even when the consumers' states' lending laws would not allow such high rates for nonbank lenders. That is fraud in fact and in law. *Goldman v. Simon Prop. Grp., Inc.*, 31 A.D.3d 382, 382, 818 N.Y.S.2d 245, 246 (2006); *Cohen v. Eisenberg,* 697 N.Y.S.2d 625 (N.Y. App. Div. 1999).   The true lender here is defendant WBL which is a non-depository that cannot bootstrap onto the rate exportation rights of the nominal lender. *United States v. Grote,* 961 F.3d 105, 122 (2d Cir. 2020) (finding sufficient evidence of wire fraud consisting of misrepresenting the true lender where "the Tribes had no meaningful influence or control over the lending business, but rather served merely as a cover").

50.     The National Bank Act does *not* apply to *state* banks, so they cannot directly take advantage of the NBA's preemption authority. Lake Mills is a state-chartered bank. The fact that state banks are insured by the FDIC also provides little or no federal preemption of state regulation, as the Federal Deposit Insurance Act (FDIA) does not generally preempt state laws. Lake Mills despite the whistles and bells was not true lender. As so well put more than a century back: *a search for usury shall not stop at the mere form of the bargains and contracts relative to such loan, but that all shifts and devices intended to cover a usurious loan or forbearance shall be pushed aside, and the transaction shall be dealt with as usurious if it be such in fact.  Crim v. Post*, 41 W. Va. 397, 23 S.E. 613 (1895). See also, *Scott v. Lloyd*, 34 U.S. (9 Pet.) 418 (1835) (The ingenuity of lenders has devised many contrivances by which, under forms sanctioned by law, the [usury] statute may be evaded. . . . [I]f giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.").

51.     Here in this case, the loan to Ms. Jordan was arranged by WBL Team, the security interest in the property is obtained by mortgage paper prepared by WBL.  The collusion between WBL and Bank of Lake Mills is evident from the paperwork provided in discovery.

52.     As stated earlier it is the dog-birds of WBL who are scouring the locality and markets and looking for vulnerable minority homeowners or business owners.   These bird-dogs are of themselves of minority groups for they could be found to be personable, and the borrowers could trust them.  In or around December 2015, one of the bird-dog pays a visit to Ms. Jordan, day care center. And after some conversation and after ascertaining that Ms. Jordan has a house with substantial equity induces her to sign up for a loan. An application is provided for which will have the name of both WBL and Bank of Lake Mills.  **Ex. D (the Loan Application).**

53.     On December 29, 2015 Tarik Rizk, one of the bird-dogs [soliciting customers for WBL] send the following email:

> Hi Gillian
> Please take 5 minutes and fill this application out, sign and
> return it back to me ASAP,if you feel anything is missing to
> make this an easier process for both of us ,please kindly send it
> and let me know, good to hear your voice
> Have a happy & healthy new year, lets make it great together
> Thank you!!!
> **Sincerely,**
> **Tarek Rizk**
> Finance Analyst
> **WBL Funding**
> 6800 Jericho Turnpike
> Suite 201W
> Syosset, NY 11791
>
> Direct: (516) 321-2613
> Cell: (631) 631-312-6252
> Fax: (516) 321-2601

On January 7, Jason Quinn using his email JQuinn@wbl.com  at 11:42 am sends an email to Ms. Jordan,

> Gillian,

I hope all is well, I'm just reaching out to you to let you know that we looked at all the documents and feel we have a strong file here, so with that being said we are going to move your file to processing. The only thing left that I need is this ACH form filled out, this is for the BPO (appraisal) and title. Also, please attach a copy of driver's license and a voided check. As soon as we get this back we can proceed. If you have any other questions please contact Tarek or myself.

Thank you,

*Jason Quinn*
*Branch Manager*

*WBL Funding*
*6800 Jericho Tpke.*
*Suite 201 W*
*Syosset, NY 11791*
*Direct: 212-220-3996*
*Fax: 646-786-4183*
*Cell: 631-804-0932*
*Email: jguinn@wbl.com*
*Web: www.wblfunding.com*

Ms. Jordan on the same date asks him [through another employee of WBL Tarek] questions via email:

Hi Tarek
I have a few questions.
What is the amount of the loan?
What are the terms?
What is the ACH for and the cancelled check?

Jason Quinn responds to the same on the same date,

Hello Gillian,
We can do a loan amount of up to around $350k-400k whatever works for you. These numbers are all based on what you have told us and what we see on our end.
The term of the loan we can do anywhere up to 24 months, obviously the further out you go the more expensive the money is. The ACH is for the BPO and title search, $590 total, the fees are very expensive for us so getting the $590 up front eliminates a little bit of the clients who are just shopping and not really committed to working with us. If you have any other questions, feel free to call Tarek or myself.

On January 22, 2016, Paul Weissburg of WBL sends the following email to Ms. Jordan asking her for additional information:

**From:** Paul Weissburg <PWeissburg@WBL.COM>
**Date:** January 22, 2016 at 3:17:42 PM EST
**To:** "gillianJordan@gmail.com" <gillianjord on@gmail.com>

WBL00337
**Cc:** Jason Quinn <JQuinn@wbl.com>, Yasemin <yasemin@wbl.com>
**Subject: Welcome to World Business Lenders!**
Gillian:
Thank you for your time yesterday. In order to complete your credit application, please provide the
following items. I apologize if you have sent these items in already, I have not been able to procure
them.
-The following bank statements:
Noah's Ark Prep - Missing July through Jan except October
Noah's Ark Prep II - Bank account ending 3377, July, Aug 2015, Dec, Jan
Noah's Arc - missing Chase 0837 - 7/2015-1/2016
- Need applications for all entities including EIN (see attachment)
Noah's Ark Prep Inc.
Noah's Ark Prep II Inc.
Noah's Arc Prep Inc.
- Mortgage modification documents
- Discontinuance of Lis Pendens from Nationstar Mortgage LLC
- Lease agreement (if applicable) for collateral property
Please feel free to email me any time with any questions.
Paul Weissburg
Analyst
World Business Lenders LLC
120 West 45th St.
New York, NY 10036
212-220-6019


On January 25, 2016 Ms. Jordan sends an email to Jason Quinn:

**From:** Gillian Jordan [mailto:gillianJordan@gmail.com]
**Sent:** Monday, January 25, 2016 3:18 PM
**To:** Jason Quinn
**Subject:**
Jason
I'm doing some number crunches. Just need to get some facts.
$8k/weekly on $275k
Payback over a period of 15 months???
What is the interest rate??
Thank you
Gillian

Jason Quinn responds:

**From:** Jason Quinn
**Sent:** Monday, January 25, 2016 3:28 PM
**To:** Gillian Jordan
**Subject:** RE:

It's a factor rate of a 1.89. 100% the money is a little expensive but with this money you can open up the new school and the business will pay for the loan. The credit is what puts a damper on things. I'll do anything I can to get this done for you.

On January 29, 2016, WBL and its agents had Ms. Jordan sign the closing papers via Docusign.net:

On Friday, January 29, 2016, WBL Closing via DocuSign <dse_na2@docusign.net> wrote:



WBL Closing sent you a document to review and sign.
**REVIEW DOCUMENT**
**WBL Closing**
closing@wbl.com
Gillian Margaret Jordan-De Verteuil,
Please DocuSign CoBorrower_Full Docs_ Noah's Ark.pdf, Payoff Auth.pdf
Thank You, WBL Closing

On January 29, 2016, Jeff Oliver from his email Joliver@wbl.com sends an email to the plaintiff

and to other WBL members, the following message:

Gillian Margaret Jordan-De Verteuil:
Our correspondent bank inadvertently wired your Business Checking Account the amount of $275,000.00 instead of the disbursement amount of $217,579.21.
The corresponding bank has requested that your bank immediately reverse the wire proceeds in the full amount of $275,000.00. Your bank may contact you, however in order to expedite this reversal you may want to place a call to your customer service representative acknowledging this transaction. Upon receipt the correspondent bank will immediately wire the correct amount.
World Business Lenders will reimburse you for any wire fees you may be assessed by your bank in relation to this wire, as well as your first daily payment.
Should you have any questions, please feel free to contact me directly at the number below.
Regards,
Jeff Oliver
Vice President - Compliance Officer
World Business Lenders
120 W. 45th St.
5th Floor
NY, NY 10036
Direct: (212) 271-8265
Email: joliver@wbl.com

On February 1, 2016 an correcting email is sent by Jeff Oliver stating the following

Jeff Oliver <JOliver@wbl.com> Mon, Feb 1, 2016 at 2:29 PM

To: "gillianJordan@gmail.com" <gillianJordan@gmail.com>
Cc: Robert Pardes <RPardes@wbl.com>, Victoria Nazarko <VNazarko@wbl.com>,
Karen Wang <KWang@wbl.com>,
Robert Lemaire <RLemaire@wbl.com>, Momtaj Malik <MMalik@wbl.com>
Gillian Margaret Jordan-De Verteuil:

> Pursuant to your conversation with Momtaj Malik today, please find below the
> wiring instructions to return the wire in the amount of **$57,420.79** which
> represents the in accordance with your loan approval. Please advise as soon as
> possible when this wire has been returned . Your cooperation in this matter is
> greatly appreciated.

**Send to:**
BMO Harris, N.A. 111 West Monroe St. Chicago, IL 60690
(312) 461-2833 ABA: 071000288 Swift: HATRUS4  To Credit: Bank of Lake Mills, 136
E Madison Street, Lake Mills, WI, Account # 24092882.

On March 22, 2016, Ms. Jordan is expressing concern to Tarek Rizk, an agent  bird-dog employee of WBL:

> Tarek,
> Please see attached authorization form. I have no idea how this was
> attached to my house. I am the sole owner of the house.

The loan here was facilitated by WBL. WBL controlled all the aspects of origination of the loan,

assignment to servicing to foreclosure. There were several other emails  and mail wire transaction

between the parties which showed that WBL was the lender of the loan. The said evidence within

the exclusive custody of the Participants of the criminal enterprise.

54.      WBL and its agents with collusion from Lake Mills obtained mortgage lien on her house.

Ms. Jordan was surprised at one point when the information sought pertained to her house. She

did express her surprise that the house was not to be a part of the deal. On March 22, 2016 Tarek

Rizk, the bird-dog wrote the following email:

> Gillian,
> Hi if you open the attachment  and fill that out and send it back, this will be what the back
> offices will need to release the funds held back, Jason and I will go to bat for you, call me
> if you need anything.

 On March 22, 2016, she wrote to  back WBL's Tarek Rizk:

> Tarek

> Please see attached authorization form. I have no idea how this was attached to my house. I am the sole owner of the home.

55.    WBL insisted that this was a condition for the release of the funds.

56.    WBL and its associates used deceptive means to tie her to a loan that she could not service. And Lake Mills actively participated initially to provide it the necessary out of state bank colorable right to charge any interest that they could do. WBL charged the plaintiff an interest rate exceeding 117% clearly violating the criminal usury cap of New York state.

### FIRST CAUSE OF ACTION
### (Violation of Violation of 18 U.S.C § § 1962(b), (c), (d) against all Defendant)
### Kings County Supreme Court (Kings Enterprise)

57**.**    Ms. Jordan repeats and realleges paragraphs 1 through 54 as if fully set forth herein

58.    This cause of action is asserted against all Defendants except Lake Mills (the "**Count 1 Defendants**") and is asserted in addition to and in the alternative to the Second , Third, Fourth, Fifth and Sixth Causes of Action, *infra.*

59.    Section 1962(c) of Title 18 of the United States Code makes it illegal for "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

60.    Section 1962(c) of Title 18 of the United States Code makes it illegal for, "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

61.    At all relevant times, each of the Count 1 Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3), 1962(b) and (c).

62.     From the time of the commencement of foreclosure and unlawful debt collection action in the New York Supreme Court, Kings County, i.e. around July 19, 2016 until now (**Foreclosure Action**), the Kings County Supreme Court have constituted an enterprise **(Kings Enterprise)** within the meaning of 18 U.S.C. §§ 1961(4), 9162(b) and (c) which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

63.     Kings County Supreme Court is the trial court and a court of general jurisdiction existing under the laws of the State of New York and is distinct from the defendant and acts of the complained of defendants. It entertains online filings and as well as by mail which commences and continue legal proceedings impacting interstate and foreign commerce.

64.     From time of the commencement of the of the foreclosure action, on or about July 7, 2016 and even now, this Count 1 Defendants committed several acts  and coordinate with each other for the the purpose of  facilitating, committing, perpetuating, and concealing the fraudulent and other criminal conduct alleged herein with the aim of unlawfully depriving Ms. Jordan any defenses and to take over her house.

65.     The Defendants used both mail and electronic means to commence and sustain and achieve unlawful results. All filings by WBL and its team was through New York court facilitated electronic system. From 2016 until now, this Count Defendants operating the state court filings in violation of mail and wire fraud and misled the state court and as well Ms. Jordan.  Among other acts, this Count Defendants committed the following acts in furtherance of nefarious design and as well as to avoid any state or judicial scrutiny.

66.     In the filed Foreclosure Complaint with the state court, WBL and its agent attorneys made the following statement:

> For good and valuable consideration, the Borrower made, executed and delivered to Lake Mills ("Original Lender") a note in the principal amount of $275,000.00, dated January 26, 2016 (the **"Note"**). *A copy of*

the Note is attached to this complaint as **Exhibit B** and its terms are incorporated herein by reference.

5. Guarantor executed a Continuing Guaranty, dated January 26, 2016 in which she guaranteed the obligations of the Borrower under the Note. *A* copy of the Guaranty is annexed hereto as **Exhibit C.**

6. As security for payment of the Note, the Guarantor, as mortgagor, executed, acknowledged and delivered to Original Lender, as mortgagee, a mortgage, dated January 28, 2016 (the "Mortgage," together with the Note, and the Guaranty, the "Loan Documents"). A copy of the Mortgage is attached to this complaint as **Exhibit D** and its terms are incorporated herein by reference. The Mortgage was recorded in recorded in CRFN 2016000054746 in the Office of the New York City Register, on February 18, 2016, and the mortgage recording tax, to the extent any was required, was duly paid.

7. By Assignment of Mortgage dated January 28, 2016, plaintiff purchased from the Original Lender, all rights, title and interest in the Loan Documents. Plaintiff is also in possession of originals of the note and mortgage mentioned above along with valid endorsements to the plaintiff.

8. Pursuant to the Mortgage, the Borrower assigned to plaintiff all of its rights, title and interest to the Property, and the improvements and chattel located thereon.

The foregoing statement made by WBL was false, for it was always WBL who was the true lender

and Lake Mills role was to aid and abet WBL to achieve its goals of avoiding usury restrictions.

67.    On or about January 26, 2016, WBL prepared e-Note (**Note)** and had it sent to it through

their bird-dog employee to have it esigned by Ms. Jordan which was e-signed. On the bottom of

each page was a place for initials by WBL. Also, the Note bore the following statement:

If Borrower desires to prepay, Borrower shall forward a written request to WBLPayoff@wbl.com [which was **WBL email]** In addition, Borrower may contact Lender's Servicing Agent at 120 W. 45th St. 29th Floor, New York, NY 10036 [which was **WBL branch**] or at 212-293-8200 [**WBL phone number]** and Lender's Servicing Agent shall provide Borrower with the amount of the unpaid Principal, prepayment premium, and any other amounts due under the Terms of the Loan Agreement as of a date designated by Borrower. For the avoidance of doubt, as permitted under applicable law, if the Obligations (as defined below) have been accelerated on the happening of an Event of Default (as defined below), payment of Principal and interest shall be deemed a prepayment for purposes of this Section 4 and shall be accompanied by a prepayment premium.

**Ex. A.** The Note ¶ 4.   WBL claimed in the Foreclosure Action that within 2 days of the issuance

and execution of the Note, WBL on January 28, 2016, became an assignee of the Note. It was a

false statement; the fact was that the WBL was the original lender and had used Lake Mills name solely to avoid the New York usury cap.

68.　　WBL used its own affiliate and an associate company Worldwide Land Transfer (WLT) to structure the deal to record the stated mortgage. On or about February 18, 2016, WLT prepared the mortgage to be recorded with the City Register of the City of New York which reflected Lake Mills as the mortgagee (**Mortgage Recordation**).  However, within 11 days, i.e. on February 29th, 2016, WBL Vice-President Alex Nadler acting as the Attorney-in-Fact for Bank of Lake Mills assigned the mortgage to WBL (**Mortgage Assignment**).

69.　　Mortgage Recordation and Mortgage Assignment were all pre-prepared by WBL. In fact the Mortgage documents states that the "Recordation [is] requested by: World Business Lenders, LLC" and "When Recorded [it is to be] mailed to: World Business Lenders LLC and also the "Tax Notices [were to be sent to] World Business Lenders LLC [at]  120 West 45th Street, New York NY 10036." See **Mortgage Recordation.**

70.　　WBL and its agents were conducting business in New York without complying with the New York state laws and for the same they were aided and abetted in this venture by Lake Mills.

71.　　Ms. Jordan on August 16, 2016 filed an Answer to the Complaint that the loan violated New York state usury laws and thus was not enforceable.

72.　　On August 21, 2016, WBL through its state counsel filed a motion for summary judgment (SJM).  It was filed by Court's established ECF system.

73.　　In the efiled SJM, Ms. Shannon Flood, an employee of WBL made the following statements in support of the motion for summary judgment, under the penalty of perjury:

> For good and valuable consideration, the Borrower made, executed and delivered to Lake Mills on January 28, 2016, a Business Promissory Note and Security Agreement in the principal amount of $275,000.00 (the "Note"). Plaintiff came into possession of the original note endorsed in blank before the commencement of the action.

Shannon Flood's Affidavit. This is a false statement. WBL and its employee including Ms. Flood

knew that the statement was false, for Lake Mills did not come to possess original note prior to the

commencement of the case, the Note always stayed with WBL.

74.     WBL's attorney Mr. Jeffrey Zachter in support of the SJM, made the same statement that,

"[by Assignment dated February, 3, 2016 Lake Mills assigned all of its rights, title and interests in

the Loan Documents to WBL." This statement was false to mislead the state court to believe that

it was Lake Mills who granted the loan, when it fact, Lake Mills was being used a rubber stamp to

evade New York state usury caps.

75.      In support of SJM Defendants counsel Mr. Zachter made the following statement in the

efiled **Memorandum of Law:**

> b. The Provisions Of NY Criminal Usury. Penal Law §190.40 Do Not Apply To The Instant
> Matter
>> New York Consolidated Laws, Penal Law §190.40
>>> *A person is guilty of criminal usury in the second degree when,*
>>> *not being authorized or permitted by law to do so, he knowingly*
>>> *charges, takes or receives any money or other property as interest*
>>> *on the loan or  forbearance of any money or other property, at a*
>>> *rate exceeding twenty-five per centum per annum or the*
>>> *equivalent rate for a longer or shorter*
>>> *period.*
>> In the instant matter, NY Penal Law §190.40 does not apply because New
>> York state law is preempted by Federal Law. Under Section 27 of the
>> Federal Deposit Insurance Act, a bank that has a state charter and is
>> federally insured may impose finance charges and late fees in accordance
>> with the interest rate laws of the state where the bank is located. See 12
>> U.S.C. § 1831d. In *Greenwood Trust v. Commonwealth of Massachusetts*
>> (971 F.2d 818), the First Circuit held that section 1831d embodied a
>> "principle of exportation" which "provides the mechanism whereby a bank
>> may continue to use the favorable interest laws of its home state in certain
>> transactions with out-of-state borrowers". *Greenwood Trust v.*
>> *Commonwealth of Massachusetts,* 971 F.2d 818,828 (1992). More
>> explicitly, the *Greenwood* court held that section 1831d allows state
>> chartered, federally-insured banks to choose, as their interest rate ceiling,
>> "the highest rate allowed by the laws of the state where the bank is
>> located." Id. This is not just the opinion of the courts, but the opinion of
>> the Federal Deposit Insurance Corporation ("FDIC") as well. "[S]ection
>> 1831d has been construed to provide State banks with "most favored
>> lender" status and *to permit State banks to "export" interest charges*

*allowed by the state where the lender is located to out-ofstate borrowers".*
Federal Deposit Insurance Corporation General Counsel's Op. No. 11,
*Interest Charges by Interstate State Banks* (63 Fed. Reg. 27282, May 18,
1998) (Emphasis added). Courts have reinforced this notion repeatedly
noting, "the non-usurious character of a note should not change when the
note changes hands". *Federal Deposit Ins. Corp. v. Lattimore Land Corp.,*
656 F.2d 139 (1981).

III. **THE PERSONAL GUARANTY IN THIS MATTER IS
GOVERNED BY WISCONSIN LAW**

The foreclosure action at issue in this matter relates to the Guarantors
property which is located in Brooklyn. Therefore, pursuant to the
guaranty, Wisconsin law will apply.

The personal guaranty explicitly indicates that they will be governed (1)
by federal law and (2) by Wisconsin law. Further, pursuant to Wis. Stat.
Ann. § 138.05, under Wisconsin Law, an individual guarantor of a
corporate indebtedness cannot interpose the defense of usury if the
defense is not available to the corporation as the principal obliger.

Pursuant to the personal guaranty:

Interpretation. Lender is an FDIC insured, Wisconsin state chartered bank.
CONSEQUENTLY, THIS GUARANTY WILL BE GOVERNED BY
FEDERAL LAW APPLICABLE TO AN FDIC INSURED
INSTITUTION AND TO THE EXTENT NOT PREMPTED BY
FEDERAL LAW, THE LAWS OF THE STATE OF WISCONSIN
WITHOUT REGARD TO CONFLICT OF LAW RULES. The legality,
enforceability, and interpretation of this Guaranty and the amounts
guaranteed will be governed by such laws. (Emphasis Added.)

Accordingly, federal law and the laws of the State of Wisconsin apply to
the review of the personal guaranty.

In <u>Klein y. On Deck Capital. Inc</u>., 2015 NY Slip Op. 50958, the court held,
in a usury case in connection with a commercial loan, that a choice-of-law
provision shall be enforced so long as the chosen law bears a reasonable
relationship to the parties or the transaction."  Here, like in Klein, there is
a reasonable relationship to Wisconsin as the original Lender is located in
Wisconsin.
	Based on the personal guaranty, the parties have agreed that
Wisconsin law should apply. This court should join uphold the parties'
agreement and, in keeping with other decisions issued by this Circuit,
apply Wisconsin law. In Wisconsin there is no maximum legal rate of
interest on commercial loans

SJM Memorandum of Law, p 15-16.

76.     This Memorandum of Law falsely claimed Lake Mills was the true lender when in fact it was WBL that engineered the loan, did the underwriting and prepared all the paperwork and had Lake Mills join the criminal enterprise to evade New York state regulatory laws.

77.     Defendants knew about the falsity of the statement that they made in the state court filing.

78.      In support of their SJM also filed on October 11, 2018 through the Court efiling system, a "Statement of Material Facts as to which there is no Genuine issue[s] to be Tried."  Defendants once again the statement claimed that they are assignee of the loan, "[b]y Assignment dated February 3, 2016 Lake Mills Assigned all of its rights, title and interests in the Loan Documents to WBL."  This statement was false, for filing Defendants knew that it was Lake Mills was not the true lender and that Lake Mills had joined hands for their commission to rubber stamps loans which were not serviced by them and would not be serviced by them and the sole purpose of this out of state loan façade was solely to evade New York state laws.

79.     On January 9, 2019, Defendant WBL's counsel once again reiterated their reply paperwork efiled with the case:

> On February 3, 2018, all rights, title, and interest in the Loan was sold and transferred by BLM to WBL. (See Flood Aff., ¶ 7, Ex. D; Supp. Aff., ¶ 8.) To memorialize the sale and transfer, the Loan was specifically identified by ID, name, and terms in the Exhibit to the Loan Assignment and Bill of Sale, an Allonge was executed for attachment to the Note, and an Assignment of Mortgage was executed and recorded.

WBL Reply Affirmation in Support of SJM. In addition, WBL also stated,

> Further, BLM is a state-chartered insured depository institution governed by the Federal Deposit Insurance Corporation and enjoys the right to port the interest rate of its home state, expressly preempting any conflicting state law in the same manner as Sections 85 and 86 of the National Banking Act. (See 12 USC § 1831d[a] ; Hill v Chemical Bank, 799 F Supp 948, 951 [DMinn 1993]; Greenwood Trust Co. v Commonwealth of Mass., 971 F2d 818, 827 [1st Cir 1993] ; see also Beneficial Nat'l Bank v Anderson, 539 US 1, 10-11 [2003] (confirming preemption of state usury claims under the National Banking Act).) Accordingly, pursuant to § 1831d, New York usury law is preempted and Wisconsin law should be imported and applied to the transaction.

Ibid ¶ 44. WBL made the foregoing statements to mislead the state court to have a judgment entered in their favor. WBL and its associates knew the statements to be false and that they would result in irreparable damage and deprivation of home.

80.     WBL and its associated concealed the true lender [which was WBL) and also concealed the fact that Second Circuit Court of Appeals in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) had held that non-national bank entities that purchase loans originated by national banks cannot rely on the National Bank Act to protect them from state-law usury claims.

81.     Had WBL disclosed its true identity as the true lender, it would not have been able to obtain the judgment that it did obtain.

82.     WBL and its associates, those operating as bird-dogs solicited minority business vulnerable customers, it made decisions to approve or not to approve the borrower. WBL prepared the mortgage loan documents, and it serviced the loan. In case of default, the loss was to be born by WBL. Lake Mills was complicit in this design. It earned its commission. The loan did not even go to its ledgers.

83.     Pursuant to the discovery obtained, it became clear that WBL "serviced and administered the loans, bore all the risk on the loans in the event of default, paid all the legal fees and expenses related to the lending program, retain[ed] more than 99% of the profits on the loans, and indemnified Lake Mills against all claims arising from bank's involvement in the loan program. Rather, Lake Mills actively supported this criminal enterprise to share the ultimate loot which robbed people of their houses and business.

84.     In furtherance of their interest, the Defendants obtained the judgment and took over the role of enforcement of judgments and made the state court issue judgment of sale on March 9, 2020.

85.    Defendants violated 18 U.S.C. § 1962(c).

86.    Each of these entities holds uniquely distinct roles.

87.    The Kings Enterprise is a state court, with an ascertainable structure and functions as continuing unit with separate roles and responsibility primarily adjudicating the rights of the individual, granting enforceable judgment and enforcing such judgments.

88.    While the Defednants did participate and continue to do so in the conduct of that enterprise by commencement of action with its registry, filing paperwork and then enforcing the judgment, they each have an existence separate and distinct from the Kings Enterprise.

89.    At all relevant times, Naidu, WBL and its team members, associated with the Enterprise knowingly conducted the Enterprise's affairs or knowingly participated, directly or indirectly, in the conduct of the enterprise's affairs.

90.    At all relevant times and contuing now, since 2016, WBL and its team operated, controlled, or managed the Kings Enterprise through various actions.

91.    Defendants directed, operated, and managed the affairs of the Kings Enterprise.

92.    WBL could not accomplish the enterprise's affairs on its own. To succeed in states with interest rate caps, WBL had have the loan stamped as Lake Mills' Loan (rent a bank) that WBL could claim as the purported lender on the loans.

93.    WBL entered contracts with Lake Mills to effect the rent-a-bank scheme and the illegal loans and had assignment executed to mislead the state courts including the Kings County, which was the enterprise. The illegal loans, that which evade New York state usury caps could not have been successful in the state court, but for the complicity of Lake Mills and the notorious rent-a-bank scheme.

94.     In order to pursue its unlawful aims, WBL made several filings with the Kings Enterprise with aim of obtaining an unlawful judgment using unlawful means.

95.     New York bans usurious loans.   New York's criminal usury statutes, N.Y. Penal Law § § 190.40, .42, criminalize loans in excess of 25 percent per annum, while New York General Obligations Law § 5-501 and New York Banking Law § 14-a render unenforceable loans in excess of 16 percent per annum. In order to overcome these legal strictures, WBL and its team schematic with an out of state bank like Lake Mills to project as the original lender and itself as the bonafide assignee of the loan. WBL loans exceeded the New York state usury caps.

96.     Naidus and his team unlawfully crafted the loan as that of Lake Mills and then had it assigned to itself when in fact WBL was the true lender in fact and law. And the façade of assignment was solely a subterfuge to mislead the state court and obtain a judgment.

97.     Naidus and WBL did achieve success in filing false statements with the Kings Enterprise.

98.     By filing false statements, Defendants acquired and maintained an interest in Kings Enterprise.

99.     Kings Enterprise electronic filing and ruling by the presiding judge impacts interstate or foreign commerce.

100.    At all relevant times, the conduct of the Count 1 Defendants and their co-conspirators has taken place in and has directly, substantially, and foreseeably affected and restrained interstate commerce.

101.    The judgment obtained by unlawful manipulating the Kings Enterprise, the Defendants achieved a judgment resulting in a lien devouring the entire equity of the house of the Plaintiff, destroying any possibility of recovery in business with the attachment of any funds.

102.    This injury to the Plaintiffs sole property, a house resulted by defendants' unlawful acquisitions and or maintenance of the interest in the Kings Enterprise and by such unlawful manipulations.

103.    Each of the Defendants, employed and or associated with the Kings Enterprise, conducted or participated in, directly or indirectly, the management or operation of state court filings etc. with Kings Enterprise  and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c); to wit, each has committed multiple predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D), and conspired with other Defendants to commit and aid and abet other Defendants' commission of the same, since at least 2016 and continuing to the present day.

104.    Naidus owns and controls the other defendants barring Lake Mills. Directly and through his agent officers, directors, board members, employees, and representatives, Naidus have been an active participant and central figure in the operation of prosecuting the foreclosure action and filing statements which are false. The foreclosure complaint and concealing the applicable laws based on falsely representing that Lake Mills is the true lender, Naidu has conducted the state court foreclosure in the state court and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to deprive Ms. Jordan of her house.

105.    Each of the Defendants committed and aided and abetted acts of mail and wire fraud,  and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957.

106.    Naidus was from the inception of the Count 1 Enterprise until is the head of the WBL and its affiliate companies including WBL SPE III LLC,  he had ultimate executive authority over ther individual Defendants in this action.  Naidus B had knowledge of the various parts of the transactions including the loan in question and how his lending was structured, but he failed to

disclose and facilitated and authorized those unlawful failures to disclose, beginning at least with the filing of the lawsuit against Ms. Jordan.  Naidus committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957.

107.    As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962 (b) (c) by the Count 1 Defendants, Ms. Jordan  suffered an immediate and direct injury from the Count 1 Defendants' racketeering activity. Because of the racketeering activities of the Defendants and putting the state court judicial machinery to unlawful use, having acquired an interest as plaintiff in the Kings Enterprise and manipulating the state court filings and to engineering an unlawful result thereby resulting in judgments that wiped away entire equity of the Plaintiff's house, the plaintiff suffered loss to her property.

108.    The damages to Ms. Jordan are but not limited to, loss of her house which she would had continued to keep un-assailed, in the absence of the Count 1 Defendants' unlawful conduct; other lost business opportunities (including pre- and post-bankruptcy work); and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for the Count 1 Defendants' criminal activities.

109.    It was a foreseeable, natural, direct, and intended consequence of the Count 1 Defendants' scheme that WBL and its team would have a state court judgement entered in its favor  (for which it was not qualified).  There are no independent factors that account for Ms. Jordan injury, nor is that injury in any way derivative of any injury to any  other party. There is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations.

110.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c),  Ms. Jordan is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### Bankruptcy Fraud and Bankruptcy Court as an enterprise
### Violation of 18 U.S. C. § 1962(b), (c) and (d) against Naidus, WBL, WBL SPE III, LLC and John Does

111.    Ms. Jordan repeats and realleges paragraphs 1 through 110 as if fully set forth herein

112.    This cause of action is asserted against Naidus, WBL, WBL SPE III, LLC and John Does (collectively, the "**Count 2 Defendants**"), and is asserted in addition to and in the alternative to the First Cause of Action, *supra*, and the Third and Fourth Cause of Action, *infra*.

113.    At all relevant times, Ms. Jordan was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964 (b) and (c).

114.    At all relevant times, each of the Count 2 Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962 (b), (c).

### Bankruptcy Court as the Count 2 RICO Enterprise and its Effect on Interstate Commerce

115.    From the date of the bankruptcy filing March 23, 2022  and continuing now, Bankruptcy Court constitute an enterprise 18 U.S.C. §§ 1961(4) , 1962(b), (c), within the meaning of those provisions.

116.    Bankruptcy judges "constitute a unit of the district court to be known as the bankruptcy court" for each district. 28 U.S.C. § 151. The present bankruptcy court is presided over by Hon. Nancy H. Lord.  This unit, is the alleged Enterprise within the meaning of foregoing provision **(Bankruptcy Court Enterprise)**

117.    The Bankruptcy Court Enterprise is a federal court distinct from the acts of the Count 2 Defendants and each Defendant is a person that exists seperate and distinct from the Count 2 Enterprise.

118.    From the inception of the bankruptcy filing until including now, the racketeering County 2 Defendants conducting, participated directly and indirectly in the conduct of affairs of the

Bankruptcy Court Enterprise through a pattern of racketeering activities and in collection of unlawful debt as explained below in violation of section 1962(c).

119.    From the inception of the bankruptcy filing until including now, the racketeering County 2 Defendants through a pattern of *racketeering activity a*nd through collection of an *unlawful debt* acquired, maintained, directly and indirectly an interest in or control of Bankruptcy Court enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce in violation of section 1962(b).

120.    Accordingly, at all relevant times, the Count 2 Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

121.     At all relevant times, the conduct of the Count 2 Defendants and their co-conspirators has taken place in and affected the interstate commerce of the United States.

122. In the bankruptcy court the Count 2 Defendants conducted their activities through racketeering means as explained the undermentioned paragraphs.

123.    Defendants through its special vehicle WBL SPE III and its legal team, Parker Ibrahim & Berg LLP filed proof of claim for a sum of $2,262,801.39 demanding interest at 117.70% (POC).

124.    The POC is signed by John Murphy, senior vice president of under the penalty of perjury.

125.    As a part of POC, Defendants attach loan transactions activities sheets, Promissory Note and Security Agreement which on filed POC purports to show Lake Mills as the loan originator and WBL as the assignee of the loan.

126.    WBL files the foregoing papers with full knowledge that Lake Mills was not the true lender, rather WBL is the lender, with stakes in the loan and that Lake Mills was a cover to evade New York state usury cap.

127.    This Count defendant makes a fraudulent representation, concealing the material facts that the said Note was in violation of the applicable New York state laws.

128.    The filed POC along with the attachments as submitted, constitutes the knowing and fraudulent making of a false oath, declaration, certificate, verification, or statement under penalty of perjury pursuant to 28 U.S.C. § 1746, in or in relation to any case under the Bankruptcy Code, within the meaning of 18 U.S.C. §§ 152(2) and 152(3).

129.    The present Count defendants used mail and wire means to file a fraudulent POC.

130.    On May 3, 2022, the Plaintiff's undersigned counsel filed a motion for Rule 2004 examination of  some of the parties involved in this case.

131.    On May 10, 2022, WBL SPE III LLC and WBL's counsel filed an objection to the request. Same was efiled and copies mailed to the undersigned. WBL SPE III LLC opposed the motion despite full knowledge that Lake Mills was not the true lender and that WBL itself had been the lender, originator of the loan and servicer and real party to the loan.  WBL despite such a knowledge makes the following among other misleading statements:

> The Mortgage was thereafter assigned from BLM to WBL by virtue of an Assignment of Mortgage, dated February 25, 2016 and recorded in the Office of the City Register of the City of New York on May 19, 2016 in CRFN 2016000171711 (the "First Assignment").

See Court docket # 26 (WBL SPE III LLC memorandum) p.5.

132.    Despite full knowledge that the underlying judgment was obtained by false representation about the nature of the loan, the identity of the lender, WBL SPE III LLC counsels improperly attempts reinstate the false representation.  WBL SPE III LLC is fully aware that the said representation are false.

133.    On February 19, 2022, the Plaintiff filed her motion to convert to the instant Chapter 11 case to one under Chapter 13.

134.    WBL and its team opposed the motion to convert. In fact, used fraudulently obtained judgment and claim based on misrepresentation to this Court to thwart the conversion relief. WBL stated that "[c]reditor filed its Proof of Claim for $2,262,801.39 on April 25, 2022," to stifle any conversion. WBL and its team knew that the said loan figure was in violation of New York state usury cap and had they told the truth of the loan originator and true lender identity, they would not have been able to obtain any judgment.

135.    WBL SPE III LLC does not stop there, it also opposes the confirmation of the proposed Chapter 11 plan filed in the pending Chapter 11 case.

136.    On July 5, 2023, WBL and its counsels filed objection to the confirmation reinstating false statements about the nature of their claim. The falsity is that the claim is not enforceable as violating New York usury laws and also violates the RICO provisions. In order to evade the usury limits, WBL and its team unlawfully emphasizes that the loan is of Lake Mills and not subject to usury limits.

137.    Naidus and WBL's counsels committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) knowingly causing at the filing of false and misleading declarations regarding the identity of the true lender and the fact that judgment was obtained by false statements, filed on behalf of WBL and other defendants in this bankruptcy case.  Each of the said submissions constitutes  the knowing and fraudulent making of a false oath, declaration, certificate, verification, or statement under penalty of perjury pursuant to 28 U.S.C. § 1746, in or in relation to any case under the Bankruptcy Code, within the meaning of 18 U.S.C. §§ 152(2) and 152(3).

138.     Each of this Count  Defendants engaged in a scheme to defraud the debtor and the Court through the false denial, concealment, and obfuscation of real nature of the loan thereby depriving the debtor of her righteous claim to her equity in the property and other legal benefits [including declaration of that the loan is void], it would otherwise have obtained. This Count Defendants

accomplished their scheme to defraud the debtor and the Court [as they did to the state court] by systematically filing with the bankruptcy court a perjurious POC, objection to the Rule 2004 examination and objection to conversion of the case [on debt issue] and objection to confirmation of the plan with false statement. This Count Defendants each knows these said statements to be materially false and misleading or incomplete in that such statements omitted, concealed, or distorted facts which would necessitate nullification/non-collectability of the loan.

139.    In furtherance of the scheme, and as described herein, this Count Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier in violation of 18 U.S.C. § 1341. This Count Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud include, but are not limited to, said filings. It also includes the several bankruptcy court filings including appearances before the Court through Zoom and email servicing of its filings across state line.  Section 1343 makes it illegal for anyone to use, or cause the use of "wire, radio, or television communication in interstate or foreign commerce" for the purposes of executing a scheme to defraud or to obtain money by false or fraudulent pretenses.

140.    Accordingly, this Count Defendants committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection aforesaid filing in the bankruptcy court.

141.    Further, it is likely that each of the false and misleading declarations submitted by WBL counsels in each of its filing  was transmitted by mail and/or by interstate wire, particularly given that the individual Defendants are spread across different states. Accordingly, in addition to the

foregoing instances of mail and wire fraud, it is likely that each the Defendants committed and aided and abetted mail and/or wire fraud in connection with the false and misleading declarations submitted by WBL.

142.    Each of these Count Defendants, through their direct or indirect corporate or executive control of WBL, knew of, and participated in, numerous acts of mail and wire fraud. In particular, each of this  Count  Defendants, through their control of and/or participation in WBL, sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of WBL collection of loan, or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Count Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires enumerated above.  Each of these Defendants knew that their various  declarations or preliminary drafts thereof would be transmitted by the mails or interstate wires, as did those filed in bankruptcy court.

143.    To the extent proof of reliance is legally required, in engaging in the aforementioned mail and wire fraud, the Count Defendants knew and intended that the  debtor ,  the bankruptcy judge, the Department of Justice, the U.S. Trustee and the other attorneys would reasonably rely on the Count Defendants' misrepresentations and omissions, which would result in WBO obtaining and retaining controlling clout in the estate  with usurious amount of demand  to which it was not entitled and which would have otherwise been inured to Debtor's benefit.

*Obstruction of Justice in Violation of 18 U.S.C. § 1503(a).*

144.    In connection with Ms. Jordan bankruptcy, this Count Defendants violated 18 U.S.C. § 1503(a), which makes it unlawful to influence, obstruct, or impede the due administration of justice, or to endeavor to do so, or to endeavor to influence or impede any officer in or of any court

of the United States. WBL SPE III LLC and its counsel aided and abetted those violations by authorizing and facilitating Defendants' acts of obstruction of justice.

145.    Ms. Jordan bankruptcy is a judicial proceeding constituting the administration of justice as required by 18 U.S.C. § 1503(a).

146.    The term "officer in or of any court of the United States" includes the presiding bankruptcy judge. *United States v. Fulbright,* 69 F.3d 1468 (9th Cir. 1995).

147.    The U.S. Trustee in the Ms. Jordan  case is an officer in or of a federal court for purposes of 18 U.S.C. § 1503(a).

148.    Mr. Gerard R. Luckman is an officer in or of a federal court for purpose of 18 U.S.C. § 1503(a).

149.    This Count Defendants, acting through their counsel acted with wrongful intent or improper purpose to influence Ms. Jordan bankruptcy proceedings and corruptly intended to impede the administration of that judicial proceeding. Specifically, by representing to the bankruptcy court and the U.S. Trustee that the underlying loan documents bears a truthful disclosure about the loan amount and the identity of the true lender.  The filings by the Defendants deliberately failed to disclosure the real nature of the loan i.e. Lake Mills was not the true lender and that WBL was subject to New York state usury caps and that it violated federal racketeering laws in collecting an unlawful debt.

150.    In knowingly causing multiple materially false and misleading declarations to be filed, to mislead the sub V trustee and the bankruptcy court so that WBL unenforceability/un-collectability of the subject loan  would not be discovered and so that WBL and its team  could continue to profit from the bankruptcy court filed POC and entitling it to claim in the estate proceeds, this Count Defendants corrupted the administration of justice. Through this fraudulent conduct, these

Defendants corruptly endeavored to obstruct, influence, or impede an officer in or of the bankruptcy court, to wit, the Mr. Luckman, who was acting as an officer in or of the court in the discharge of his duty, in violation of 18 U.S.C. § 1503(a).

151.    Since the filing of the bankruptcy in March 2022 and the present the Count 2 Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in Count 1, *supra*, in paragraphs delineating bankruptcy fraud, mail and wire fraud and obstruction of justice, and other predicate acts to be identified after further investigation and discovery herein.

152.    Each of the Count 2 Defendants engaged in and aided and abetted two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action, *supra*. The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating true lender identity, to obtain bankruptcy approbation of their filed POC, that they would not have received had the Count 2 Defendants behaved lawfully, and been honest about its past and how they obtained the state court judgement and how it it is tainted with usury, thereby depriving Ms. Jordan of her home, denying her righteous claim to deny the POC.

153.    These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission. Through such patterns of racketeering activity, each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise in violation of 18 U.S.C. § 1962(b) and (c).

154.    As set forth in the foregoing paragraph, this Count Defendants aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing false and misleading statements in the bankruptcy court. Thereby also each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the false and misleading statements including filing of POC.

155.    Each of the Count 2 Defendants' scienter is demonstrated by the facts set forth in Count 1, *supra*.

156.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Count 2 Defendants, Ms. Jordan suffered an immediate and direct injury from the Count 2 Defendants' racketeering activity. Specifically, Ms. Jordan suffers  the loss of her property related to the restructuring it would have acquired, had the Count 2 Defendants not implemented their scheme and acquired a judgment by misleading the state court and filing the same as a POC in the Court, for which they were not qualified through their violations aforesaid provisions and related predicate acts.

157.    Ms. Jordan's damages include, but are not limited to, loss of her house and monies she has to spent to pursue her chapter 11 case. It was a foreseeable, natural, direct, and intended consequence of the Count 2 Defendants' scheme of evading the state usury limits. There are no independent factors that account for Ms. Jordan's injury, nor is that injury in any way derivative of any injury to any other party.

158.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Jordan, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against All Defendants*
<u>*Association in Fact Enterprise*</u>

159.    Ms. Jordan repeats and realleges paragraphs 1 through 158 as if fully set forth herein

160.    From December of 2015 (said date being approximate and inclusive) and continuing to the

present,  the defendant  identified above have constituted an *association-in-fact enterprise* within the

meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "**Count 3 Enterprise**" or **Association in Fact**

**Enterprise**).

161.    The Count 3 Enterprise is structured through (1) the formal corporate ownership

relationships among the defendants (2) the preexisting agreements between Naidus and his team

with  Bank of Lake Mills (3), the sharing of commission for branding of WBL loan as Lake Mills'

and then enforcing the loan terms unlawfully without full disclosure that the real lender in this case

was none other than WBL. Although the precise composition of the Count 3 Enterprise changed

over time with the inception of the loan, commencement of state foreclosure action and stay of the

state action with the instant bankruptcy filing in March 2022 the overall character and purpose of

the Count 3 Enterprise was consistent—extortionist credit transaction under the pretext that the

same is not government by any usurious cap.

162.    At all relevant times, each of the Count 3 Defendants was, and is, a person that exists

separate and distinct from Count 3 Enterprise.

163.    Count 3 Enterprise was engaged in, and its activities affected, interstate and foreign

commerce as demonstrated in the foregoing paragraphs.

### Pattern of Racketeering

164.    Each of the Count 3 Defendants engaged in a pattern of racketeering activity within the

meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the

meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described below and in Counts 1

and 2, *supra*, and others to be identified after further investigation and discovery herein. Each of the Count 3 Defendants engaged in two or more RICO predicate acts, and each committed at least one such act after the effective date of RICO. The Count 3 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First and Second Causes of Action, *supra*

### RICO Predicate Acts

165.     Naidus committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as the owner CEO of the WBL and its affiliate defendant companies.

166.     WBL committed and aided and abetted the predicate acts described below and in Counts 1 and 2 from at least December 2015 until now as the chief engine for churning out loans to unwary vulnerable minority borrower including Ms. Jordan, evading state regulatory bodies claiming falsely usury exemption from New York placed usury cap by projecting that the loans are funded, originated and are of a bank which cannot be regulated by the states.

167.     WLT committed and aided and abetted the predicate acts described below and in Counts 1 and 2 from at least December 2015 for it provided title related services and supported the criminal enterprise by putting mortgages on the properties of the borrower including Ms. Jordan house.

168.     WBL SPE III LLC is a special purpose vehicle committed and aided and abetted the predicate acts described below and in Counts 1 and 2 from at least March 13, 2019, has now after 3 assignment is the receptacle of the usurious loan mortgage.

169.     The Bank of Lake Mills is the notorious alleged originator of the loan, when in fact it was not. It is the hench-man operating on behalf and under command of Naidus. The loans subject of this lawsuit are solicited, prepared and taken over by WBL and Lake Mills colludes with the WBL in its racketeering scheme by providing stamp as originator of the loan and when the loans do not even stay for a day in the books of the bank.  Lake Mills committed and aided and abetted the

predicate acts described below and in Counts 1 and 2 by providing its stamp, fully aware that the loans in questions will be used for unlawful objectives.  Lake Mills have been doing the same since 2014 and to the subject loan since 2014. Even though its role limited in terms of time, but it played the most substantive role, by playing cat's paw, stamping loan as its own, when in fact it had no skin in the game. It was not the servicer of the loan, it had no stakes. But its stamp lived with the life of the loan and it played havoc with the lives of borrowers.

170.    Naidus, WBL and WBL SPE III LLC committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing to be filed false and misleading declarations including a perjuriously obtained state court judgment and filing POC which is unlawful, as Naidus, WBL and WBL SPE III LLC are aware that the Lake Mills was not the true lender.

171.    All the defendants committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by authorizing, facilitating, filing and causing to be filed the false and misleading declarations on their own behalf and behalf of others.

172.    Lake Mills provided its name despite full knowledge that it was not the provider of the loan, it did not bring the customers to get the loan, it did not provide service regarding the loan, the loan were not even registered in its regular books, rather there was  a separate pool of loan especially created for racketeering needs including for facilitating unlawful debt collection. Lake Mills and Naidus's WBL entered into special agreement to have loan structured in such a way that it is gives the look of Lake Mill as the real lender issuing funds. This was done for unlawful reasons—the biggest to evade New York state or other state usury caps. For these purposes, Lake Mills and WBL agents communicated with each other through emails, mails and telephones and transacted about the loan packages including those of Ms. Jordan.  Because of the knowing wink,

WBL prepared  and filed paperwork on behalf of Lake Mills, got to do the mortgage recordation and assignment including obtained a power of attorney to act on behalf of Lake Mills. This was all done through violation of mail and wire fraud statute.  Each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the recording of the mortgage in New York state and subsequent alleged mortgage assignment. WLT actively prepared the said paperwork to accomplish the unlawful objective.

173.    The specific operational interrelationships between these three corporate Defendants and the specific capacities in which the employees and/or agents acted in filing the mortgage recordation, assignment and loan related papers is within these Defendants' exclusive knowledge and will be identified after further investigation and discovery herein.

174.    The Count 3 Enterprise pattern of racketeering also, included acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

175.    Once the loan was set in place by WBL, there followed payments obligation in the year 2016.  Until April 2016, Ms. Jordan attempted to meet her obligations.  These financial transactions entailed movement of funds by wire other means from Ms. Jordan bank to WBL. The monies derived from or obtained or retained, directly or indirectly, through the enumerated fraud of WBL and its team constitutes the process of an unlawful specified activity" within the meaning of 18 U.S.C. § 1956 (c).

176.    The Count 3 Defendants, conducting and controlling the Count 3 Enterprise, knew that the property involved in each money laundering transaction represented the proceeds of the WBL fraud upon Ms. Jordan.

177.    The Count 3 Defendants demanding and the payment of onerous amount of unlawful installment payments through means of wire violated 18 U.S.C. §§ 1956 and 1957 and same directly and proximately caused injury to Ms. Jordan's business rendering Ms. Jordan insolvent.

178.    In furtherance of the scheme to take over the assets of Ms. Jordan, Naidus and his team and agents brought the foreclosure proceeding in the Kings County Supreme Court and made misleading statements to the court for achieving an unlawful objective.  Naidus and his team were aware that the said loan was in violation of New York state usury cap and that it violated the unlawful debt collection prohibition of civil racketeering laws, yet it went ahead insisting that the loan was that of Lake Mills and they are just assignees, knowing fully well that the said statements were false.  Such conduct and acts continued in the state court until the filing of the bankruptcy in March of 2022.

179.    The defendants Naidus and WBL and WBL SPE III LLC further committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by knowingly authorizing and causing to be filed the false and misleading affidavits filed on WBL in the state court and as well as the bankruptcy court as delineated above.

180.    Naidus, WBL and WBL SPE III LLC, committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed the false and misleading paperwork including declarations filed on its loan behalf in the bankruptcy court.

181.    As set forth in Count 2, supra, the attorneys for WBL, WBL SPE III LLC aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a).

183.    WBL, WBL SPE III LLC and its owner Naidus, each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c), in the Plaintiff's bankruptcy.

184.    WBL, WBL SPE III LLC,  committed and obstruction of justice in violation of 18 U.S.C.

§ 1512(c) by corruptly obstructing, influencing, and/or impeding Ms. Jordan bankruptcy and/or by

attempting to do so by filing or causing to be filed false and misleading POC, statements regarding

the claims and debts owed to them  in that case which were intended to (and did) fraudulently

induce the bankruptcy judge to deny conversion motion to Chapter 13; and aided and abetted each

other Defendants' violations of 18 U.S.C. § 1512(c) by authorizing and facilitating their unlawful

conduct on behalf association in fact enterprise in Ms. Jordan bankruptcy case.

185.    Naidus, WBL and its agents after the signing of the loan paperwork demanded and had

successfully obtained repayment of the some of the loan amount. It was only after April 18, 2016

that she could not make the payment, as it was an extortionist credit. These receipts of installment

payments from Ms Jordan by means of wire transfer and the subsequent deposit or other financial

transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 3

Defendants each knew that such financial transactions involved amounts exceeding $10,000 and

that such monies were criminally derived from specified unlawful activity within the meaning of

18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7). Such specified unlawful activity includes,

without limitation, the violations of 18 U.S.C. §§ 1341, and 1343 set forth above. The specific

chains of monetary transactions are within Defendants' exclusive knowledge and control and will

be identified in discovery and proven at trial.

186.    The Count 3 Defendants' receipt of the proceeds of these specified unlawful activities and

their subsequent deposit or other financial transfers of such proceeds violated 18 U.S.C. § 1957(a)

in that the Count 3 Defendants each knew that such financial transactions involved amounts

exceeding $10,000 and that such monies were criminally derived from specified unlawful activity

within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3). The specific details of the monetary

transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

187.    Through such patterns of racketeering activity, each of the Count 3 Defendants, employed and associated with the Count 3 Enterprise conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 3 Enterprise in violation of 18 U.S.C. § 1962(c).

188.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Count 3 Defendants, Ms. Jordan suffered an immediate and direct injury from the Count 3 Defendants' racketeering activity. Specifically, Ms. Jordan suffered the loss of her property. Had the Count 3 Defendants did not implement their scheme and acquired the state court judgment with false pretense and mischaracterization of the true lender identity, Ms. Jordan would have had the legal defenses to the loan and its enforcement.  Also, the Debtor would not have been in bankruptcy and incurred the legal expense that she did in this case.

189.    The injury caused to Ms. Jordan is direct and foreseeable and is intended consequences of the Count 3 Defendants' scheme.

190.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Jordan, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees

### FOURTH CAUSE OF ACTION VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### *Against All Defendants Except the Bank of Lake Mills*
### <u>Unlawful Debt Collection</u>

191.  Ms. Jordan repeats and realleges paragraphs 1 through 190 as if fully set forth herein.

192.    From December of 2015 (said date being approximate and inclusive) and continuing to the present,  the defendant  identified above have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "**Count 4 Enterprise**").

193.    The Count 4 Enterprise is structured through (1) the formal corporate ownership relationships among the defendants (2) the preexisting agreements between Naidus and his team with  Bank of Lake Mills (3), the sharing of commission for branding of WBL loan as Lake Mills' and then enforcing the loan terms unlawfully without full disclosure that the real lender in this case was none other than WBL. Although the precise composition of the Count 4 Enterprise changed over time with the inception of the loan, commencement of state foreclosure action and stay of the state action with the instant bankruptcy filing in March 2022 the overall character and purpose of the Count 4 Enterprise was consistent—extortionist credit transaction under the pretext that the same is not prohibited by government by any usurious cap.

194.    At all relevant times, each of the Count 4 Defendants was, and is, a person that exists separate and distinct from Count 4 Enterprise.

195.    Count 4 Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in the foregoing paragraphs.

196.    It is unlawful for a RICO enterprise to engage in the collection of an "unlawful debt." 18 U.S.C. § 1962(c).

197.     An "unlawful debt" is a debt (A) "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and (B) "which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

198.    The loans that Defendants issued to Ms. Jordan is an unlawful debt under RICO law.

199.    The loans issued to Ms. Jordan and demand for its returns is more than twice the amount permitted by New York state law relating to usury.

200.    The loans issued to Ms. Jordan were incurred in connection with the business of lending money at a rate usurious under New York law where the usurious rate is at least twice the enforceable rate.

201.    New York law bans unlicensed business of lending of money. But in case there is a commercial loan, it must not exceed 24% interest rate.

202    Defendant's loans are unenforceable under New York' laws relating to usury.

203.    The loans to Ms. Jordan is void. Ms. Jordan is entitled to recover all payments made so far. A single instance of a collection of unlawful debt violates RICO.

204.    Defendants' activities in Kings County have been operational since 2016 and still continuing.

205.    Ms. Jordan has lost all her equity in her house by virtue of an unlawful lien obtained unlawfully by the Defendants.

206.    Ms. Jordan was also injured because she had made payments repaying the principal. WBL was not entitled to the return of principal.

207.    From at least in or about 2016  up to and including until now the Naidus and WBL defendants, and others known and unknown, are employed by and associated with the Count 4 Enterprise described above, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce, willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt.

208.    The collection of unlawful debt,  that term is defined in Title 18, United States Code, Sec ion 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws related to usury  and (B) which was incurred in connection with the business of lending money and a thing

of value at rates usurious under the laws of the State of New York and other States, where the usurious rates were at least twice the enforceable rates, through which Naidus and WBL the defendants, did conduct and participate in the affairs often enterprise, which was engaged in and the activities of which affected interstate commerce, consisted of collecting and attempting to collect an unlawful debt as follows:

a.  From at least 2016 to up to and until now, Naidus, and his company WBL and its agents a and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from the plaintiff. On July 30, 2019, WBL made an attempt, a demand to collect on the unlawful debt which had morphed from an amount $275,000 to $1.45 million within a short span of three years. WBL through its vice president Shannon Flood made the following demand:

> Dear Valued Client,
> In connection with the Business Promissory Note and Security Agreement dated 01/26/2016 made by Noah's Ark Preparatory, Inc. (the "Borrower") to Bank of Lake Mills (the "Lender") in the principal sum of $275,000.00 (the "Note"), with the Note assigned to World Business Lenders, LLC and further assigned to WBL SPE II, LLC (the "Assignee"), you have informed us that it is the Borrower's intention to pay in full the balance of your loan. The Total Payoff Amount required is indicated below. The Payoff Amounts indicated below are valid as of the corresponding payoff dates and assume that any recent daily payments are not reversed for insufficient funds or other reasons. In providing this information, Assignee is not waiving any of its rights with respect to amounts due pursuant to the terms of the Loan Agreement, and in the case of any conflict ( whether due to error or otherwise) between the amounts set forth in this letter and amounts due under the Loan Agreement, the Loan Agreement shall control. This Payoff Amount should be wire-transferred to Assignee in immediately available funds in accordance with the following wire instructions
> **Bank: IDB Bank**
> **Account Name: WBL SPE** II, LLC
> **Routing Number: 026009768**
> **Account Number: 1319195**
> *Upon receipt of good funds, the property located at **455 Macon St. Brooklyn, NY 11233,** recorded as CRFN 2016000054746 in the Office of the City Register of the City of New York, will be released. Further, the foreclosure complaint, Index No.:512316/2016, pending before the Supreme Court of the State of New York County of Kings, will be dismissed. Please contact the undersigned if you need additional

information. We greatly appreciate the opportunity to have been of service
to Noah's Ark Preparatory, Inc.
Sincerely,
Shannon Flood.

**LOAN PAYOFF AMOUNT**
**Date Total**
07/30/2019 $1,451,935.32 Per Diem $819.99

WBL made the said demand and stated that they would release the lien, if they get the paid the
unlawful debt of $1.4 million on a loan of $275,000.

b. From at least 2017 to up to until now, Naidus and his company WBL and its agents and
others known and unknown, participated in the collection and attempted collection of
unlawful usurious loans from the plaintiff by bringing an action in the state court, Kings
County enforcing the unlawful claims attempting to realize on the collateral of the plaintiff.
On July 19, 2016, WBL commenced an action to collect the unlawful usurious loan and as
well as to foreclosure on the home of the plaintiff which was taken as a security for the
loan.  On March 9, 2020, the state court entered a judgment and foreclosure of real property
the home of the Plaintiff based on exhortation by the defendants that the loan is a lawful.

c. From the time of the filing of the bankruptcy of the plaintiff, WBL and its agents and others
including its attorneys participated in the collection and attempted collection of unlawful
usurious loans from the plaintiff by filing a proof of claim in the bankruptcy court claiming
at an rate that is double the usury rate of New York state criminal usury.  For an alleged
loan of $275,000, in 2016, WBL demands as of March 23, 2022 payment of $2,262,801.39
crossing an interest rate of 117.79% by filing a proof of claim making an attempt to collect
on an unlawful usurious loan.

209.    The loan to Ms. Jordan is void. Ms Jordan is entitled to return any and all payments made
so far. A single instance of a collection of an unlawful debt violates RICO. That said, WBL and

its team engaged in widespread conduct and has issued lot of loans to vulnerable minorities including Ms. Jordan. All these loans are unlawful debts.

210.    The Count 4 Enterprise has a longevity sufficient permit WBL to pursue the enterprise's purpose. It has been operating this unlawful debt collection since 2014.

211.    Ms. Jordan has been injured as a direct result of the WBL and its team violation of section 1962(c), i.e. collection on an unlawful debt. Ms. Jordan has lost the equity in her house and saddled with debt imposed by unlawful means.

212.    As a result of Defendants' exploitation of the vulnerability of the Debtor and misleading the plaintiff, the courts and state regulatory bodies, the character and identity of true lender the Plaintiff suffered monetary damages, attorneys fees, loss of equity in her home and shut down of her business.

213.    Under 18 U.S.C. § 1964 (c), the Plaintiff is entitled to recover treble the Debtor's general and special compensatory damages, plus interest, costs, and attorneys' fees caused by reason of Defendants' violation of 18 U.S.C. § 1962 (c).

### FIFTH CAUSE OF ACTION VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### *Against All Defendants Except the Bank of Lake Mills*
### <u>Hobbs Act Violation</u>

214.    Ms. Jordan repeats and realleges paragraphs 1 through 213 as if fully set forth herein.

215.    From December of 2015 (said date being approximate and inclusive) and continuing to the present, the defendant identified above have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "**Count 5 Enterprise**" or A**ssociation-in-fact Enterprise**).

216.    The Count 5 Enterprise is structured through (1) the formal corporate ownership relationships among the defendants (2) the preexisting agreements between Naidus and his team

with Bank of Lake Mills (3), the sharing of commission for branding of WBL loan as Lake Mills' and then enforcing the loan terms unlawfully without full disclosure that the real lender in this case was none other than WBL. Although the precise composition of the Count 5 Enterprise changed over time with the inception of the loan, commencement of state foreclosure action and stay of the state action with the instant bankruptcy filing in March 2022 the overall character and purpose of the Count 5 Enterprise was consistent—extortionist credit transaction under the pretext that the same is not prohibited by government by any usurious cap and to take over the property of the borrowers without any lawful claim.  These defendants have committed a pattern of repeated violation of §§ 1951 for the past 7 years (and longer), which are "acts of racketeering" pursuant to 18 U.S.C. §§ 1961(1)(B) and (C), respectively.

217.    At all relevant times, each of the Count 5 Defendants was, and is, a person that exists separate and distinct from Count 5 Enterprise.

218.    Count 5 Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in the foregoing paragraphs.

219.    The Count 5 Defendants conducted, participated, directly or indirectly, in the conduct of said Count 5 Enterprise's affairs through a pattern of racketeering activity, primarily through violation of Hobbs Act, 18 U.S. § 1951. And the said enterprise constitutes an ongoing organization whose members function as a continuing unit that has a common purpose.

220.    The Count 5 Defendants used wrongful means to achieve a wrongful objective.

221.    The Count 5 Defendants had the plaintiff mortgage her house and sign Note that which the Defendants were not entitled to have. These Defendants had Ms. Jordan sign a promissory Note for a sum of $275,000 with an interest rate exceeding 117% rate per annum.

222.    The Count 5 Defendants wrongful means was using and then projecting Bank of Lake Mills as the true lender and then using the same misleading statement to have a judgement from the state court Kings County swallowing the entire equity of Ms. Jordan's. In essence, the resulting judgment lien took over the entire house of the debtor.

223.    The Count 5 Defendants had no lawful claim to the collection of the debt and property of the Debtor for WBL was not the true lender. WBL and its team for wrongful purposes used Bank of Lake Mills stamp to achieve an unlawful result which they could not have achieved without using the said employed means.

224.    The Count 5 Defendants had no lawful claim for a collection on a debt accreting extortionist rate of interest exceeding 117% as WBL was the true lender. And WBL was not an out of state bank with any benefit of federal preemption.

225.    WBL and its team carried on lending business from the city and state of New York, and thus were amenable to the jurisdiction and laws of New York State.

226.    New York state laws ban such loans. New York usury may either be criminal or noncriminal. For example, New York's criminal usury statutes, N.Y. Penal Law § § 190.40, .42, criminalize loans in excess of 25 percent per annum, while New York General Obligations Law § 5-501 and New York Banking Law § 14-a render unenforceable loans in excess of 16 percent per annum.

227.    Despite the foregoing legal prohibition, WBL demanded extortionist amount of money to release its hold from the property. When the Plaintiff made a cry for help in and around July 30, 2019,

WBL through its vice president Shannon Flood made the following demand:

Dear Valued Client,
In connection with the Business Promissory Note and Security Agreement
dated 01/26/2016 made by Noah's Ark Preparatory, Inc. (the "Borrower")

to Bank of Lake Mills (the "Lender") in the principal sum of $275,000.00 (the "Note"), with the Note assigned to World Business Lenders, LLC and further assigned to WBL SPE II, LLC (the "Assignee"), you have informed us that it is the Borrower's intention to pay in full the balance of your loan. The Total Payoff Amount required is indicated below. The Payoff Amounts indicated below are valid as of the corresponding payoff dates and assume that any recent daily payments are not reversed for insufficient funds or other reasons. In providing this information, Assignee is not waiving any of its rights with respect to amounts due pursuant to the terms of the Loan Agreement, and in the case of any conflict ( whether due to error or otherwise) between the amounts set forth in this letter and amounts due under the Loan Agreement, the Loan Agreement shall control. This Payoff Amount should be wire-transferred to Assignee in immediately available funds in accordance with the following wire instructions
**Bank: IDB Bank**
**Account Name: WBL SPE** II, LLC
**Routing Number: 026009768**
**Account Number: 1319195**
*Upon receipt of good funds, the property located at **455 Macon St. Brooklyn, NY 11233,** recorded as CRFN 2016000054746 in the Office of the City Register of the City of New York, will be released. Further, the foreclosure complaint, Index No.:512316/2016, pending before the Supreme Court of the State of New York County of Kings, will be dismissed. Please contact the undersigned if you need additional information. We greatly appreciate the opportunity to have been of service to Noah's Ark Preparatory, Inc.
Sincerely,
Shannon Flood.

**LOAN PAYOFF AMOUNT**
**Date Total**
07/30/2019 $1,451,935.32 Per Diem $819.99

WBL made the said demand and stated that they would release the lien, if they get the paid the unlawful debt of $1.4 million on a loan of $275,000.

228.     Count 5 Defendants obtained a judgment from the state court, misleading the state court, hiding their identity to evade the New York prohibitions.

229.     Count 5 Defendants having obtained the judgement scheduled a foreclosure sale of her house. These defendants reached this stage by using inherently wrongful means.

230.     Ms. Jordan suffered a nervous breakdown and went through a trauma of losing her home.

231.     Ms. Jordan could not and cannot transact with her house as a property because of the defendant's judgment lien.

232.    Ms. Jordan could not transact with her business, avail any credit as she suffered an unlawful judgment besides an unlawful mortgage on her property.

233.    Ms. Jordan is therefore entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION FOR VIOLATION OF 18 USC § 891-894
### Against all Defendant for *Extortionist Credit Transaction*
### Extortionist Credit Transaction Enterprise

234.    Ms. Jordan repeats and realleges paragraphs 1 through 233 as if fully set forth herein.

235.    From 2014 (said date being approximate and inclusive) and continuing to the present, the defendant identified above have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "**Count 6 Enterprise**" or **Extortionist Credit Transaction Enterprise**).

236.    The Count 6 Enterprise is structured through (1) the formal corporate ownership relationships among the defendants (2) the preexisting agreements between Naidus and his team with Bank of Lake Mills (3), the sharing of commission for branding of WBL loan as Lake Mills' and then enforcing the loan terms unlawfully without full disclosure that the real lender in this case was none other than WBL. Although the precise composition of the Count 6 Enterprise changed over time with the inception of the loan, commencement of state foreclosure action and stay of the state action with the instant bankruptcy filing in March 2022 the overall character and purpose of the Count 6 Enterprise was consistent—extortionist credit transaction in violation of New York state law where the plaintiff resides and where her business was incorporated at the time of extension of credit, interest rate exceeding 45% per annum and WBL had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof wich including attachment of assets and seizures of accounts and foreclosure of homes etc. These

defendants have committed a pattern of repeated violation of §§ 891-894 for the past 7 years (and longer), which are "acts of racketeering" pursuant to 18 U.S.C. §§ 1961(1)(B) and (D), respectively.

237.    At all relevant times, each of the Count 6 Defendants was, and is, a person that exists separate and distinct from Count 6 Enterprise.

238.    Count 6 Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in the foregoing paragraphs.

239.     The Count 6 Defendants conducted, participated, directly or indirectly, in the conduct of said Count 5 Enterprise's affairs through a pattern of racketeering activity, primarily through violation of Extortion Credit Transactions as codified under 18 U.S.C. §§ 891-904 And the said enterprise constitutes an ongoing organization whose members function as a continuing unit that has a common purpose.

240.    The Plaintiff is a natural person and was resident of New York at the time of the subject transaction of extension of credit.

241.    The plaintiff here is the "debtor", who guaranteed the repayment of that extension of credit given in the name of her business Noah Ark.

242.    The Plaintiff, Ms. Jordan was made to execute a esigned Promissory Note for a sum of $275,000 to the Defendants as lender or assignees with an interest rate exceeding 117%.

243.    A loan at 117% per annum interest rate is not enforceable in New York state. New York state laws ban such loans. New York usury may either be criminal or noncriminal. For example, New York's criminal usury statutes, N.Y. Penal Law § § 190.40, .42, criminalize loans in excess of 25 percent per annum, while New York General Obligations Law § 5-501 and New York Banking Law § 14-a render unenforceable loans in excess of 16 percent per annum.

244.    Naidus and his company WBL and its associates operating together had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

245.    Thus, the Count 6 Defendants violated 18 U.S.C. § 892 by making an extortionist extension of credit.

246.    Since 2014, both Bank of Lake Mills and Naidus through WBL set up a venture, an understanding wherein the loan would be stamped in the name of Lake Mills, but WBL would be projected to take over the loan assignee and this resulted in commission for Lake Mills.

247.    Bank of Lake Mills under the agreement in place with WBL violated section 893 for financing extortionist extension of credit.

248    Bank of Lake Mills knew and had reasonable grounds to believe that WBL is using the loans in question for the purpose of making extortionate extensions of credit in violation of section 893 of Title 18 as described above.

249.    The Count 6 Defendants had the plaintiff mortgage her house and sign Note that which the Defendants were not entitled to have. These Defendants had Ms. Jordan sign a promissory Note for a sum of $275,000 with an interest rate exceeding 117% rate per annum.

250.    Pursuant to the terms of the extortionist credit, WBL and its teams immediately went to the enforce its terms in the state of New York, Kings County Supreme Court, obtained a judgment by misleading the state court about the terms of the credit and applicable laws and its true identity as the real lender. WBL and its affiliate team WBL SPE III LLC filed a Proof of Claim to realize on its extortionist credit transaction.

251.    The Count 6 Defendant knowingly, participated, so conspired with each other including its attorneys to collect on the extension of the credit in violation of section 894 of Title 18.

252.    Naidus and his team Defendants have a reputation in community to threaten livelihood of

the people and their businesses including selling the assets of such borrowers if the terms of the

extortionist credit is not complied.

253.    Despite the foregoing legal prohibition, WBL demanded extortionist amount of money to

release its hold from the property. When the Plaintiff made a cry for help in and around July 30,

2019,

WBL through its vice president Shannon Flood made the following demand:

Dear Valued Client,
In connection with the Business Promissory Note and Security Agreement
dated 01/26/2016 made by Noah's Ark Preparatory, Inc. (the "Borrower")
to Bank of Lake Mills (the "Lender") in the principal sum of $275,000.00
(the "Note"), with the Note assigned to World Business Lenders, LLC and
further assigned to WBL SPE II, LLC (the "Assignee"), you have informed
us that it is the Borrower's intention to pay in full the balance of your loan.
The Total Payoff Amount required is indicated below. The Payoff
Amounts indicated below are valid as of the corresponding payoff dates
and assume that any recent daily payments are not reversed for insufficient
funds or other reasons. In providing this information, Assignee is not
waiving any of its rights with respect to amounts due pursuant to the terms
of the Loan Agreement, and in the case of any conflict ( whether due to
error or otherwise) between the amounts set forth in this letter and amounts
due under the Loan Agreement, the Loan Agreement shall control. This
Payoff Amount should be wire-transferred to Assignee in immediately
available funds in accordance with the following wire instructions
**Bank: IDB Bank**
**Account Name: WBL SPE** II, LLC
**Routing Number: 026009768**
**Account Number: 1319195**
*Upon receipt of good funds, the property located at **455 Macon St.**
**Brooklyn, NY 11233,** recorded as CRFN 2016000054746 in the Office of
the City Register of the City of New York, will be released. Further, the
foreclosure complaint, Index No.:512316/2016, pending before the
Supreme Court of the State of New York County of Kings, will be
dismissed. Please contact the undersigned if you need additional
information. We greatly appreciate the opportunity to have been of service
to Noah's Ark Preparatory, Inc.
Sincerely,
Shannon Flood.

**LOAN PAYOFF AMOUNT**
**Date Total**
07/30/2019 $1,451,935.32 Per Diem $819.99

WBL made the said demand and stated that they would release the lien, if they get the paid the unlawful debt of $1.4 million on a loan of $275,000.

254.    Count 6 Defendants obtained a judgment from the state court, misleading the state court, hiding their identity to evade the New York prohibitions.

255.    Count 6 Defendants having obtained the judgement scheduled a foreclosure sale of her house. These defendants reached this stage by using inherently wrongful means.

256.    Ms. Jordan lost all her built equity in her house.

257.    Ms. Jordan could not and cannot transact with her house as a property because of the defendant's judgment lien.

258.    Ms. Jordan could not transact with her business, avail any credit as she suffered an unlawful judgment besides an unlawful mortgage on her property.

259.    Ms. Jordan is therefore entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

260.    The foregoing is a regular practice of the Count 6 Defendants. Ms. Jordan is just one of the few individual victims of this practice.

261     At all times relevant to this Complaint Naidus and his company the defendants, and Bank of Lake Mills and were members and associates of the aforesaid Extortionist Lending, Financing and Collection enterprise (*Extortionist Credit Transaction Enterprise*), a criminal organization whose members and associates engaged in crimes including the financing,  extension and  collection of extortionist credit as described by 18 U.S.C. §§ 891-894.

262.    This Count 6 "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) - corporations associated that is, a group of individuals and in fact. This enterprise was engaged in, and its activities affected, interstate! and foreign commerce. This Enterprise was an

organized criminal group with leadership based in  New Jersey, and that operated throughout the u9ited States, including in the Eastern District of New York. The Enterprise organization constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

263.    The Count 6 Enterprise was controlled, owned and led by Naidus  the defendant, is also the CEO owner of WBL and its affiliates

264.    The purpose of the enterprise was to enrich the leader, members and associates of the enterprise through the financing, extension  and collection of extortionist credit.

265.    The means and methods by which Naidus and the defendants, and their co-conspirators, and other members and associates, conducted and participated in the conduct of the affairs of the Enterprise pleaded were the operation of financing, extension and collection of extortionist credit.

**SEVENTH CAUSE OF ACTION**
**CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)**
*Against All Defendants*

266.    Ms. Jordan repeats and realleges paragraphs 1 through 223 as if fully set forth herein.

267.    Defendants  have  each  unlawfully,  knowingly,  and  willfully  combined,  conspired, confederated, and agreed together and with others to violate 18 U.S.C. § § 1962(b) and (c) as described above, in violation of 18 U.S.C. § 1962(d).

268.    As described in each of Counts 1 through 6, *supra*, two or more people, including each of the Defendants, agreed to (and did) commit numerous violations of 18 U.S.C. § 1962 (b) and (c) to further their unlawful schemes.

269.    As described below, each Defendant agreed to further the unlawful endeavor and success described in Count 1, Count 2, Count 3, Count 4, Count 5 and Count 6.

270.    Ms. Jordan is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

271.    All the Defendants and Participants are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

272.    The Kings County New York State Court (Kings Enterprise), the New York United States Bankruptcy Court of Eastern District (Bankruptcy Court Enterprise), Association in-fact Enterprise, Extortionist Credit Transactions Enterprise are different enterprises pleaded in addition and or as alternative within the meaning of meaning of 18 U.S.C. § 1961(4) and 1962(b) and (c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

273.    With respect to the unlawful scheme and acts described above in Count 1, Count 2, Count 3, Count 4,  Count 5 and Count 6,  Bank of Lake Mills and Naidus/WBL along with team agreed to further the scheme, as demonstrated by, *inter alia*, the following facts: a) they each knew of the illegal activity—specifically, that Bank of Lake Mills is cosmetically stamping the initial papers [that too delegated to WBL through power of attorney]; b) Bank of Lake Mills have no role in the loan after having provided its name as the lender; c); Naidus through his team will have exclusive rights over the impugned loans; d) Bank of Lake Mills will not play any role in the loan, from solicitation to underwriting to approval  and obtaining lien that WBL will do whatever would take to do from loan solicitation to obtaining liens and subsequent enforcement of the loan; e) Bank of Lake Mills knew that loans in questions were prohibited by the laws of certain states including New York owing to usury cap; f) Bank of Lake Mills knew that the loans would be enforced as Bank of Lake Mills loans and unlawful use of preemption doctrines; g) Bank of Lake Mills knowingly  and willfully financed the extortionist credit transaction in collusion with WBL in violation of section 893 of Title 18; h) Naidus and its team in complicity with Bank of Lake Mills extended such a credit  in violation of section 892 of Title 18; i) Naidus and his team collected on

such an extortionist credit in violation of 18 U.S.C. § 894; j) they each facilitated and engaged in the illegal activity described in the foregoing Counts for commission granted to Bank of Lake Mills and illicit profits shares from enforcement of such loan obligations; k) they each knew that the enforcement of the loan shall be on terms of the loan projecting it as Bank of Lake Mills loan, when in fact it was not the real lender; l) they each knew that the enforcement of the loan shall be on terms of the loan projecting it as Bank of Lake Mills loan in the courts of law including state and federal courts, when in fact it was not a loan that could be enforced in any court owing to violation of the New York state usury ceiling; m) they each conspired with each other to mislead the state court through their attorneys and collection agencies of WBL; n) they each facilitated and engaged in the illegal activity including the filing of a perjurious proof of claim, claiming to be assignee of the loan to evade New York state usury and enforcing notoriously such a unlawful Note as described in each foregoing Counts.

274.    Directly and through its agent officers, directors, board members, employees, and representatives, Naidus and his wholly-owned and controlled subsidiaries have been active participants and central figures in the formation and operation of Count 1, Count 2, Count 3, Count 4, Count 5 and Count 6 Enterprise and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to deprive Ms. Jordan of her right defenses to the loan leading to the loss of her house and other properties.

275.    All the Defendants, are employed by or associated with an enterprise as defined in each foregoing Counts, that is, Kings Enterprise, Bankruptcy Court Enterprise, Association in Fact Enterprise, Extortionist Credit Transaction Enterprise conspired within the meaning of 18 U.S.C. § 1962(d) to violate §§ 1962 (b) and (c), that is, said Defendants and Participants did conspire to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, and or including obtaining proprietary interest including claim standing in the said enterprises, through

a pattern of racketeering activity within the meaning of 18  U.S.C. §§ 1961(1)(B) and 1961(1)(D) and 1961(5) and  1961(6) and 1962 (b) and  1962(c), to wit:

(a) *Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;*

(b) *Multiple instances of wire fraud in violation of 18 U.S.C. § 1343;*

(c)  *Multiple instance of bank fraud in violation of 18 U.S.C. § 1344*

(d)  *Multiple instance of bankruptcy fraud in violation of 18 U.S.C. 152.*

(e) *Unlawful deprivation of property in violation of 18 U.S.C. § 1951;*

(f)  *Money Laundering in violation of 18 U.S.C. § 1956;*

(g)  *Corruptly obstructing and influencing the bankruptcy court and system in violation of 18 U.S.C. § 1512; and*

(h) *Extending, Financing and collecting Extortionist credit Transactions in violation of 18 U.S.C.§ 891-894.*

276.    By reason of violation of 18 U.S.C. § 1962(d) committed by the Defendants, Ms. Jordan was injured in an as yet undetermined amount, believed to be not less than approximately Three Million Dollars ($3,000,000.00), within the meaning of 18 U.S.C. § 1964(c).

**EIGHTH CAUSE OF ACTION**
**Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.***
**Against Bank of Lake Mills, Naidus, WBL and John Does**

277.     Ms. Jordan re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

278.    From at least in or about 2014, up to and including in or about the time of the filing of this complaint, Defendant Naidu through his other agents corrupted the operations of the WBL and SPE, he has founded and controlled through a pattern of fraudulent schemes that victimized vulnerable targeted minority borrower customers, the state courts and now including bankruptcy courts. Exploiting the trust that vulnerable minority homeowners with small business placed in him and trust the state courts placed in him that the loans indeed did not have the usury caps and that the

loans were actually the way they were projected to be that they were bonafide assignment, Naidus managed to have the foreclosure of the houses, small business of the borrower thus enriching himself.

279.    Since its foundation, WBL led by Naidu grew quickly the defendant, grew quickly, and with it grew Naidus public profile, political influence, and personal fortune. In 2011, Mr. Naidus founded and capitalized WBL as its sole shareholder and funded its first loan in August 2011. He currently serves as a chairman and chief executive officer of WBL. And it picked up speed, for there were many vulnerable minority borrowers who could not get regular loan, or those who just very gullible.  And WBL issued loans with interest rates of up to 268%, relying on "hard-line collection practices" like seizing borrowers' personal property, and which profits from exorbitant prepayment penalties. In the present, the prepayment penalty is unprecedented.  Naidus had picked up his art of subprime lending from crisis of 2008.  He through his agents pursued his goal by having staff trained to make calls to truckers, contractors and florists across the country picking loans with annual interest rate as high as 125 percent. WBL charged most people 125 percent annualized interest rates on six-month loans regardless of their situation. The borrowers often put up cars, houses or even livestock worth at least twice as much as the loan to WBL.  And when borrowers could not pay, WBL seized their assets vehicles and assets and compelling people to seek shelter as here with the bankruptcy court.

280.    True to its model, WBL scoured for the vulnerable minorities. His bird-dogs for the same were minorities, for these bird-dogs could easily gain proximity to other minorities.

> (i) For instance, around 2013, WBL bird-dogs contacted a minority family, Maher and Tamer Kasem, a father and son who sold cigarettes and cosmetics to corner stores in Brooklyn and Philadelphia, They borrowed from World Business Lenders

in to keep their company afloat after being rejected by a bank and turned down for a hurricane-recovery loan. A saleswoman of WBL initially talked to them about an unsecured $45,000 loan, They had fallen further behind on bills by the time they received the final terms to borrow $12,500. The money, plus almost $1,000 in fees, was to be repaid over six months with $144.73 deducted from their bank account each business day, according to a contract they provided. That worked out to a total of $18,236 or an annualized rate, inclusive of fees, of about 110 percent. To clinch the deal and leaving no room to escape, Tamar and his mother Lamis were made to sign personal guarantees that they would repay the money even if the business went bust, and the family put up a vacant lot as collateral. World Business Lenders sued the Kasems and obtained a judgment for $22,828, which included a $3,879 prepayment fee.

(ii).    A Sikh minority couple Ramanjeet Kaur and her husband Kulwinder Singh Uppal fell on bad times and they wanted wanted capital to sustain their business, New England Distributor Inc. A bird-dog brought the couple to WBL. Uppal and Kaur submitted documentation to WBL, followed by a business loan application on March 13, 2018. They agreed to borrow $175,000 at WBL's lending terms of 92.5867% annual percentage rate ("APR"), which amounts to a daily interest rate of 0.250136986301%, to be paid every business day over a period of nine month. Kaur and Uppal used their residence at 9-11 Upland Park, Somerville, Massachusetts, as collateral for the personal guaranty-backed business loan. After the couple fell into arrears on the business loan payments, WBL initiated foreclosure proceedings on their home.

iii).    Since 2014, Markisha and Carlos Swepson, a black couple, have been serving up catfish breakfast, smothered pork chops and other handcrafted American food at BLVD Bistro in New York's Harlem neighborhood. The couple was a target of WBL. And they were approached by WBL bird-dog and they fell prey to the predatory grip of WBL.  Because of a lengthy renovation and lower revenues during the coronavirus pandemic, the couple are behind on two loans arranged by World Business Lenders. The loans, totaling $67,000, have an effective annual interest rate of 268 percent, court filings show. Mariksha also attacked with a foreclosure of her house in New Jersey, for WBL had taken a mortgage lien. In the foreclosure, WBL adds 30% of the loan amount as a prepayment penalty.

iv).    Imo S. Okwu, black Georgia state resident was targeted by WBL. He is the sole shareholder of a small company called Quantum-Mac.  In 2018 Quantum-Mac was presented with a unique business opportunity arising from a contract to provide engineering services that it entered into with the City of Atlanta, Georgia. He needed capital and he was looking for small capital. He was spotted by one WBL's bird-god. He was given a $50,000 loan at 88% APR, despite Georgia's 60% usury cap. WBL prepared all of the documents with BOFI Federal Bank (known known as Axos Bank) listed as the lender, and then an officer of WBL used a power of attorney for the bank to assign the loans to WBL. WBL is seeking $133,519 in interest and is threatening to foreclose on the owner's home.  Precisely at it happened with Ms. Jordan.

v.) Another minority couple, Vincent DeRamo, Jr. and Tracy DeRamo, husband and wife and residents of Sarasota County, Florida were another target and prey of WBL. In the fall of 2015, the couple's small company Homes by DeRamo needed money for cash flow purpose. WBL contacted them, saying they were an agent for a bank, and offered a $400,000 loan, secured by their home and later refinanced. Despite the promise of a 15% APR, they allege that WBL actually charged them 72-73% APR. The documents were prepared by WBL and were mailed to WBL and the plaintiffs had no contact with the bank. The mortgage was assigned from the bank to WBL through a signature of the vice president of WBL as power of attorney for the bank.

281.    Indeed, minorities are the target of WBL. And then they forge relationship with the banks who funds their discriminatory lending with extortionist interest rates.

282.    Plaintiff Ms. Jordan is an African-American homeowner, running a small dare care center.

283.    Here in this lending to Ms. Jordan, all Defendants acted jointly. The Affiliate Defendant, like WBL SPE III LLC was created by Naidus to hold legal title to the properties acquired for WBL's predatory lending scheme. Each of the Affiliate Defendants is by Naidus. The Affiliate Defendants are listed as different entities, special purpose vehicles to make it judgment proofs, despite the fact that it is Naidus conducting all business on their behalf. For purposes of this Count, "Naidus" refers collectively to all Affiliate Defendants.

284.    Under ECOA, it is unlawful for "any creditor to discriminate against any applicant, with respect to any aspect to any aspect of a credit transaction," on the "basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1).

285.    Ms. Jordan is members of a protected class on the basis of race because she is black.

286.    Based on all the facts alleged above, WBL lending scheme program with active complicity of Bank of Lake Mills  is credit as defined by ECOA, as it involved a right granted by a creditor to pay off  loans and defer payment.

287.    WBL is a creditor as set forth in ECOA because in the ordinary course of its business WBL extended credit to the Plaintiff.

288.    Bank of Lake Mills is a creditor set forth in ECOA because in the ordinary course of its business, it provided stamping of the loan as its own loan.

289.    Ms. Jordan is an applicant as defined by ECOA because she through the WBL's bird-dogs deemed to have applied to a creditor directly for an extension of credit.

290.    WBL and Bank of Lake Mills [as complicit party] practice disparately treated minority borrowers with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

290.    By the actions described throughout this Complaint, WBL and associates have engaged in, and will continue to engage in, a practice of discrimination against minority borrowers due to their race in violation of ECOA. WBL actions constitute actionable discrimination on the basis of race.

291.    WBL's business model with the knowing tacit consent of Bank of Lake Mill involves targeting credit-starved vulnerable minority communities for its predatory and abusive  loan transactions because of the race of the borrowers.

292.    Specifically, Defendants engaged in a scheme to defraud Plaintiff, and potentially countless minorities by misrepresenting to them their credit worthiness

293.    WBL's discriminatory practice of acquiring liens on homes and businesses of the minorities like Ms. Jordan on properties, has a disproportionate and unjustified impact on minorities.

294.    This nefarious practice caused and continues to cause a predictable and actual harmful disparate impact on vulnerable minorities communities and borrowers, including Plaintiff and were disproportionately more likely to be impacted by WBL practices, resulting in their eviction and loss of their home and other harmful effects, including the failure to build equity and the onerous terms required by WBL's contracts.

295.    The past and continuing acts and conduct of WBL have had and will continue to have a harmful disparate impact on minorities, in violation of the federally protected rights of Plaintiff.

296.    WBL discriminatory practice is not justified by one or more substantial, legitimate, nondiscriminatory interests.    WBL practice is also intentionally discriminatory against the borrowers on the basis of race in violation of 15 U.S.C. § 1691(a)(1).

297.    WBL contracts, as described throughout this Complaint, are unfair and predatory. As described above, WBL contracts obscure the high interest rate and true payment period required to complete repayments of the business loans. The vulnerable borrowers are usually who have invested thousands of dollars and countless hours of their own labor making the home habitable, businesses functioning properly, only to lose all of that investment and all of the money paid under the contract in the event of a default. Unlike a homeowner with a mortgage, who is entitled to keep the benefit of their labors and financial investment in a home and or business WBL borrowers  do not accrue that benefit nor build any equity.

298.    WBL's business model involves targeting credit-starved vulnerable minority communities for its predatory and abusive loan transactions because of the race of the borrowers.

299.    WBL's actions were intentional, wanton, malicious, and taken in reckless disregard of the civil rights of Plaintiff Ms. Jordan because of her race. Thus, the plaintiff Ms. Jordan is an

aggrieved person as defined by ECOA by virtue of having been parties to WBL's predatory and abusive loan transactions.

300.    As a proximate result of WBL discriminatory practice, Plaintiff has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of her home.

301.    WBL maintained its practice continuously, and it represents a continuing violation of 15 U.S.C. § 1691(a)(1).

302.    Bank of Lake Mills knew or should have known that WBL and its teams was engaged in the violations of the ECOA described in this Count and assisted, participated in, and facilitated these violations. Bank of Lake is a Wisconsin stated chartered bank doing business in the state of Wisconsin. It regularly provided stamping of loan picked up by WBL.

303.    Bank of Lake Mills enabled WBL's discriminatory actions by acting as the primary funder of WBL's  property lien acquisitions and helping design the predatory and abusive terms of its contracts that  WBL marketed to minority communities through targeted advertising. Lake Mills knew detailed information about the WBL business model, including its discriminatory practice of acquiring lien on properties through predatory means.

304.    Bank of Lake Mills provided the stamp to Naidus and his team to be used for the loans that it never was the true lender for, rather it proactively participated in the scheme to make its quick commission.  Bank of Lake Mills is subject to federal laws governing fair lending, including the Equal Credit Opportunity Act. It has extended its lending stamps to general consumer and small business, non-mortgage related installment and single loans to its customer.

305.    As a result of the above alleged ECOA violations, Plaintiff has suffered substantial actual damages in the loss of her rights to save her property, her loss of the credit itself, frustration, anger, humiliation, fear, embarrassment and other emotional and mental anguish.  The WBL and with the

active complicity of Bank of Lake Mills has its subjected its minority customers to terms and conditions for general consumer, non-mortgage loan related installment loans that resulted in those customers paying more for their loans than similarly situated non-minority customers. The duo policies and practices as alleged herein constitute discrimination on the basis of national origin against applicants with respect to credit transactions in violation of Equal Credit Opportunity Act, 15 U.S.C. § 1691(a). These policies and practices as alleged herein, constitute a pattern or practice of resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, as amended, 15 U.S.C. § § 1691-1691f.

306.    As a result of these ECOA violations, Bank of Lake Mills, Naidus, WBL and the Affiliate Defendants, Successor Defendants are liable to Plaintiff for:

     a. Compensatory and punitive damages in an amount to be determined at trial;

     b. Injunctive relief;

     c. Costs and disbursements; and

     d. Attorneys' fees

## NINTH CAUSE OF ACTION
### Violation of General Business Law § 349
### Against all Defendants

307.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs 1 through 275 as if they were set out at length herein.

308.    GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in [New York]."

309.    By engaging in the acts and practices alleged above, Defendants have engaged in deceptive and misleading practices in violation of GBL § 349.

310.    Plaintiff is suing both in her individual capacity and on behalf of the general public.

311.    Plaintiff is informed and believes and thereupon alleges that beginning at an exact date which is unknown to plaintiff, but from 2014, defendants have committed unfair and fraudulent business practices as defined by New York GBL § 349, by engaging in the following unlawful business practices:

      a.     Targeting minorities and saddling them with loan in violation of ECOA;
      b.     Using a straw-lender to evade usury caps imposed by New York state;
      c.     filing perjurious statements in the state courts;
      d.     misleading the state court and regulatory bodies regarding the identity of the true lender;

312.    The acts and practices described above were and are likely to mislead the public and therefore constitute unfair or fraudulent business practices within the meaning of New York GBL § 349.  Fourteen states, including State, and the District of Columbia prohibit have usury limits that effectively prohibit usurious  loans within their jurisdictions. For RICO offense, usury may either be criminal or noncriminal. For New York, the applicable laws, New York's criminal usury statutes, N.Y. Penal Law §§ 1 90.40, .42, criminalize loans in excess of 25 percent per annum, while New York General Obligations Law § 5 501 and New York Banking Law § 14-a render unenforceable loans in excess of 16 percent per annum but not in excess of 25 percent per annum. Under RICO, however, any "unlawful debt" under New York state law would be a criminal offense because twice the enforceable rate (16 percent) exceeds the criminal rate (any rate above 25 percent).

313.    Defendants broke these prohibition. And they did so by hiding the true identity of the true lender.  Naidus scheme was clear, he had several of these banks (the "cat's paw) like Bank of Lake Mills lined up on commission. His agents would scour the market for vulnerable small business people, usually the minorities, do all the homework and have the cat's paws stamp the transactions as their own loan, when in fact they were not the true lender, it was always WBL. The borrowers

would not meet the banks, their employees, it was always the WBL and its agents that did everything from spotting a borrower with some asset and then, filling the application, origination of the loan, and preparation of the paperwork for procurement of liens on assets and properties and then immediate transfer their off to themselves. The banks engaged momentarily as the philosopher stone that which purported to transmute an illegal loan transaction to an alleged legal one. The claim was that bank is not from New York. The bank is an OCC qualified bank and not subject to state imposed usury limits.  And to cover up the sham schemes, WBL would claim that it is an arranger of credit. However all these statements were false.

314.    Plaintiff is informed and believes that defendants unlawful, unfair and fraudulent business practices described above present a continuing threat to members of the public and that defendants continue to engage in the unfair and unlawful acts described above.

315.     Plaintiff seeks injunctive relief enjoining defendants from engaging in the unfair business practices described above.. Defendants have engaged in deceptive acts and practices by conduct including but not limited to: i) misrepresenting regarding their services; ii) misrepresenting that they are not lender; iii) failing to disclose their terms with all honesty; iv) misrepresenting that the agreements are enforceable when in fact they are void under New York law; v) misrepresenting their ability to help homeowners; vi) advancing loans and obtaining lien on the houses of people who do not have the capacity to pay such debts.

316.    Injunctive relief is proper as plaintiff has no adequate remedy at law. Monetary damages will not compel defendants to cease to engage in the unfair business practices described in this action. Plaintiff alleges that the benefit to the public good, as well as to the plaintiff, far outweighs the inconvenience to the defendants of ceasing to engage in the unfair business practices.

WHEREFORE, plaintiff prays for judgment as follows:

a. That this Court enter a preliminary and permanent injunction restraining and enjoining all defendants, and their agents, servants, employees, representatives, and anyone acting on their behalf or at their direction from engaging in, committing, permitting, or performing, directly or indirectly, any of the unfair business practices described above;

b. For restitution of damages in an amount equal $2,500,000, the amount of loss of home equity and the loss in business.

b. For reasonable attorneys' fees;

c. For costs of suit;

d. For such other relief as this Court deems proper and just.

## TENTH CAUSE OF ACTION
### Recoupment Relief against the Defendants' Proof of Claim

317.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs 1 through 285 as if they were set out at length herein.

318.    This declarative judgment adversary proceeding by Ms. Jordan is also pursuant to 11 US..C. Sec. 502 and other laws to challenge the predatory and illegal origination WBL loan and the Defendants unfair and deceptive acts and objects to the Proof of Claim (POC) for a sum exceeding $2.2m filed by WBL SPE III, LLC based on usurious terms and other unlawful reasons as described above. It also seeks remedy by way of recoupment to the filed Proof of Claim.

319.    Debtor plaintiff filed bankruptcy for saving her home.

320.    The Defendants colluded with each other to saddle the Debtor with loan of onerous terms which were not enforceable in New York state and court but for the deception by Defendants as delineated in the foregoing paragraphs.

321.    Ms. Jordan has been greatly harmed, financially and emotionally by the unfair and deceptive actions of the said Defendants.

322.    Ms. Jordan objects to WBL SPE III LLC' Proof of Claim and requests that the Court disallow the claim in full.

323.    Ms. Jordan's claims in this be deemed as counterclaim against the filed POC, are brought in this action are brought in recoupment and Ms. Jordan asserts they form a basis for the disallowance in full or part of any and all claims of WBL SPE III LLC. As WBL SPE III LLC's claim is timely, Ms. Jordan's claims in this action, which lie in recoupment, are also timely.

324.    Ms. Jordan requests that the court liquidate the claims that she brings against the defendants and apply them to any and all claims of WBL SPE III LLC thereby reducing its claim to a nullity and thereby disallowing the Proof of Claim.

325.    In addition, and in the alternative, Ms. Jordan objects to the filed POC because the underlying mortgage and note are procedurally and substantively unconscionable, as the mortgage was doomed to fail from the start, therefore may not be enforced. Wherefore, Ms. Jordan is entitled to relief, d*isallowing way of recoupment WBL SPE III LLC's claim as filed.*

326.    For all the foregoing reasons and causes of action and claims, Ms. Jordan makes the following,

## PRAYER FOR RELIEF

WHEREFORE, Ms. Jordan prays:

(a) General and compensatory damages according to proof at trial;

(b) Treble damages pursuant to 18 U.S.C. § 1964(c) for all RICO claims;

(c) Necessary and appropriate injunctive relief, including an injunction requiring full compliance by the Defendants of the New York State Usury caps and filing honest declaration in both the state and bankruptcy court as deemed proper in accordance with 18 U.S.C. § 1964(a)

(d) Disgorgement of all moneys received by Defendants as a result of their unlawful activities;

(e) An award of Plaintiffs' reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);

(f) Declaration that the policies and practices of WBL and Bank of Lake Mills and other defendants constitute a violation of Equal Credit Opportunity Act, 15 U.S. §§ 1691-1691f;

(g) Punitive damages;

(h) Prejudgment interest;

(i) Recoupment in favor of the Plaintiff nullifying the amount of claim asserted by the Defendants;

(j) For injunctive relief against Defendants to prevent future wrongful conduct; and

(k) Such other and further relief as the Court deems just and proper.

### Demand for Jury Trial in the Bankruptcy Forum

Pursuant to Federal Rules of Procedure 38 (FRBP 9015), the Plaintiff Debtor demands a trial by jury in this action of all issues so triable.

Dated: August 13, 2023
New York New York

Dahiya Law Offices, LLC
*Attorneys for the Plaintiff*

By: */s/karamvirdahiya*
Karamvir Dahiya
75 Maiden Lane Suite 606
New York New York 10038
Tel: 212 766 8000